913 A.2d 220

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Samuel CARSON, Appellant.**

Supreme Court of Pennsylvania.

Submitted May 5, 2004.

Decided Dec. 27, 2006.

Reargument Denied Feb. 9, 2007.

502

508

510

512

514

516

522

Samuel J.B. Angell, Esq., Victor J. Abreu, Esq., Philadelphia, for Samuel Carson.

Amy Zapp, Esq., Hugh J. Burns, Jr., Esq., Philadelphia District Attorney's Office, Jason E. Fetterman, Esq., for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

## OPINION

Justice CASTILLE.

This collateral capital matter is before this Court on appeal from the trial court's dismissal of appellant's petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541, *et seq.* For the following reasons, we remand appellant's layered claim of counsel ineffectiveness concerning mitigation evidence to the PCRA court for an evidentiary hearing. In all other respects, we affirm the order below.

On November 18, 1999, this Court affirmed appellant's judgment of sentence on direct appeal for the first-degree

murder of William Lloyd, *see Commonwealth v. Carson (Carson I)*, 559 Pa. 460, 741 A.2d 686 (1999),[1] and the United States Supreme Court denied appellant's petition for a writ of *certiorari* on June 5, 2000.[2] *Carson v. Pennsylvania*, 530 U.S. 1216, 120 S.Ct. 2220, 147 L.Ed.2d 252 (2000). Appellant timely filed a *pro se* petition for relief under the PCRA on June 20, 2000.

On June 28, 2000, the trial court granted a petition for stay of execution filed on appellant's behalf by Yvonne Bradley, Esq., of the Defender Association of Philadelphia. The trial court appointed Attorney Bradley as appellant's counsel and ordered that an amended PCRA petition be filed no later than September 21, 2000. Subsequently, counsel obtained several extensions from the trial court and timely filed an amended petition on September 6, 2001, followed by a supplemental petition for *habeas corpus* relief on October 1, 2001, and a supplement to the amended petition for *habeas corpus* relief on February 12, 2002. On May 23, 2002, the Commonwealth filed a motion to dismiss, and appellant filed a response in opposition to the motion on July 16, 2002.[3] In an order dated December 26, 2002, the PCRA court granted the Commonwealth's motion and dismissed appellant's petition without an evidentiary hearing. The court denied appellant's motion for reconsideration on January 6, 2003, and on June 30, 2003, issued its opinion addressing the claims raised by appellant in

1. The factual and procedural history of this case leading up to the direct appeal is set forth in that opinion. Those facts which are necessary to the examination of appellant's present collateral claims will be discussed herein as necessary.

2. Appellant was represented by Daniel H. Greene, Esq., at trial and by Jack McMahon, Esq., on direct appeal.

3. Appellant states in a footnote that the PCRA court never filed a letter announcing its intent to dismiss his petition, pursuant to Pa.R.Crim.P. 909(B)(2). Appellant's Brief at 4 n. 1. This Court has previously noted the importance of a PCRA court's adherence to Rule 909(B)(2) and has remanded cases where a PCRA court's failure to follow the Rule has impeded a petitioner's ability to obtain meaningful review. *See, e.g., Commonwealth v. Hawkins*, 583 Pa. 104, 876 A.2d 365 (2005) (per curiam); *Commonwealth v. Brown*, 574 Pa. 231, 830 A.2d 536 (2003) (per curiam); *Commonwealth v. Williams*, 566 Pa. 553, 782 A.2d 517 (2001). Here, there is no argument forwarded for relief premised upon the lapse.

his amended and supplemental petitions. *Commonwealth v. Carson*, Nos. 2837–2840 & Nos. 1841–1848 (Pa. C.C.P., Philadelphia County 2003) (hereinafter "PCRA ct."). Appellant's timely appeal to this Court follows.

In all, appellant raises a total of twenty-two claims: eight arising from the guilt phase of his trial; twelve arising from the penalty phase; one seeking PCRA discovery; and one summarily alleging that the cumulative effect of the errors asserted in each of his other twenty-one claims warrants relief. All but two of the twenty guilt and penalty phase claims sound in a layered allegation of the ineffective assistance of counsel.[4] For purposes of organization, we will address appellant's guilt phase claims first, then turn to his sentencing phase claims and then his other claims, otherwise addressing appellant's claims in the order in which they are presented in his prolix and disorganized brief.

■■ We begin by noting our decision in *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014 (2003), where this Court summarized the proper procedure for litigation and review of layered claims of ineffectiveness. In *McGill*, we held that:

[A] petitioner must plead in his PCRA petition that his prior counsel, whose alleged ineffectiveness is at issue, was ineffective for failing to raise the claim that the counsel who preceded him was ineffective in taking or omitting some action. In addition, a petitioner must present argument ... on the three prongs of the *Pierce* test as to each relevant layer of representation.

*McGill*, 832 A.2d at 1023 (citing *Commonwealth v. Pierce*, 567 Pa. 186, 786 A.2d 203 (2001)).[5] A properly pleaded claim of

4. Because appellant was represented by new counsel on direct appeal, and this case was on collateral review prior to our decision, appellant's current claims are only cognizable as layered claims. *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726, 739 n. 16 (2002).

5. The *McGill* Court cited to the 2001 *Pierce* case in explaining its holding, *McGill*, 832 A.2d at 1020. Of course, the seminal case in our ineffectiveness jurisprudence is an earlier case with the same name. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987) (adopting the United States Supreme Court's holding in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

ineffectiveness under *Pierce* posits that: (1) the underlying legal issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice befell petitioner from counsel's act or omission. *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973, 975 (1987). Therefore, in cases where appellate counsel is alleged to be ineffective for failing to raise a claim of trial counsel's ineffectiveness, *McGill* instructs that the inability of a petitioner to prove each prong of the *Pierce* test in respect to trial counsel's purported ineffectiveness alone will be fatal to his layered ineffectiveness claim. *McGill,* 832 A.2d at 1023; *see also Commonwealth v. Edmiston,* 578 Pa. 284, 851 A.2d 883, 891 (2004); *Commonwealth v. Rush,* 576 Pa. 3, 838 A.2d 651, 656 (2003). Proving trial counsel was ineffective, however, will establish the arguable merit prong of *Pierce* in respect to appellate counsel. *Rush,* 838 A.2d at 656. The PCRA petitioner is then left to demonstrate that prior appellate counsel's actions lacked a reasonable basis and prejudiced him. *Id.*

As a corollary to the layered pleading rule adopted in *McGill,* it is necessary that a PCRA petitioner have the ability to amend his petition in order to properly plead, and attempt to prove, layered claims where dismissal of the petition is imminent on grounds that such claims were not adequately pled. *McGill,* 832 A.2d at 1024. Indeed, our cases have recognized as much. *See, e.g., Commonwealth v. Washington,* 583 Pa. 566, 880 A.2d 536, 540 (2005); *Commonwealth v. Williams,* 581 Pa. 57, 863 A.2d 505, 513 (2004); *Rush,* 838 A.2d at 651. Furthermore, the ability to amend, in turn, flows from the guarantee embodied in our Rules of Criminal Procedure that a PCRA court will give a petitioner adequate notice of its intention to dismiss his petition and the attendant reasons therefor. Pa.R.Crim.P. 905(B) (PCRA judge shall order an amendment to a PCRA petition when it is defectively filed); Pa.R.Crim.P. 909(B)(2)(a) (PCRA judge shall state reasons for its intention to dismiss). In cases where a petitioner has not been afforded the opportunity to amend his layered pleadings, a remand from this Court is appropriate unless a petitioner has not satisfied his *"Pierce* burden in

526

relation to the underlying claim." *Commonwealth v. Harris,* 578 Pa. 377, 852 A.2d 1168, 1173 (2004) (quoting *Rush,* 838 A.2d at 657–58).

Additionally, before addressing appellant's individual claims, it is pertinent to note the law on previously litigated claims under the PCRA, which we are statutorily barred from reviewing according to 42 Pa.C.S. § 9543(a)(3). If the highest court in which a petitioner had the right to review a claim has evaluated the merits of that claim, the claim has been previously litigated. 42 Pa.C.S. § 9543(a)(2). This Court must, however, consider and substantively analyze an ineffectiveness claim as a "distinct legal ground" for PCRA review. *Commonwealth v. Collins,* 585 Pa. 45, 888 A.2d 564, 573 (2005). This Court recognized in *Collins* that while an ineffectiveness claim may fail for the same reasons that the underlying claim faltered on direct review, the Sixth Amendment basis for ineffectiveness claims technically creates a separate issue for review under the PCRA. *Id.* We also acknowledged that pre-*Collins* decisions by PCRA courts may have dismissed an ineffectiveness claim as previously litigated without touching on the proper Sixth Amendment merits of the claim. However, we resolved only to remand those claims that were in need of further clarification before this Court exercised its duty of review. *Id.* at 574. In this case, the PCRA court, which passed upon the issues before *Collins* was decided, disposed of a number of ineffectiveness claims on previous litigation grounds, and, thus, we have no substantive ineffectiveness analysis to review. This circumstance, however, does not require remand because we are satisfied that the claims plainly fail.

## I. GUILT PHASE CLAIMS

### A. Denial of Defense Peremptory Strike[6]

Appellant first claims that appellate counsel was ineffective in forwarding his claim on direct appeal that the trial court improperly violated appellant's right to exercise a peremptory

6. Appellant's claim I.

challenge during *voir dire*. Appellant argues that the trial court improperly seated Dorothy Spicer as a juror over his challenge despite his race-neutral explanation that he believed she looked untrustworthy. The trial court's ruling, appellant argues, violated his due process rights and his rights under the Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution and Article 1, Sections 9 and 13 of the Pennsylvania Constitution. With respect to appellate counsel's alleged deficient performance, appellant contends that appellate counsel was ineffective for failing to argue that: (1) there was no *prima facie* case of discrimination established; (2) trial counsel had accepted a white juror, Scott Yoder, whom the Commonwealth had rejected; (3) *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam), supported his claim; and (4) the trial court's ruling is not subject to harmless error analysis under *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986).

The Commonwealth responds that appellant's claim was previously litigated since appellant's challenge to seating Dorothy Spicer on the jury was decided by this Court on direct appeal. The PCRA court agreed with the Commonwealth and, accordingly, did not analyze the merits of appellant's appellate ineffectiveness claim.

On direct appeal, this Court characterized appellant as arguing that juror Spicer should not have been seated because:

> (1) the trial court erred in *sua sponte* raising the issue of the discriminatory use of peremptory challenges by the defense; (2) at the time the issue was raised there had been no pattern of prejudice establishing *prima facie* discrimination and warranting explanation for the use of peremptories; and (3) placing the juror on the panel was not the appropriate remedy.

*Carson I*, 741 A.2d at 693. While noting that the case law supported the Commonwealth's contrary position that trial courts are duty-bound to respond to and prevent racial discrimination, we ultimately stated that:

In addressing appellant's claim, we decline to step into the morass of "peremptory challenge jurisprudence" created by the United States Supreme Court. For even if we were to accept Appellant's contention that the trial court erred in raising the issue *sua sponte*, we must nevertheless agree with the Commonwealth that Appellant suffered no prejudice.

*Id.* at 696. In this regard, we observed that appellant had failed to show that juror Spicer was biased or incompetent to serve as a juror and that a defendant's right to an impartial jury of his peers does not entitle him to a jury of his choice. *Id.* (citing *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)).

The foregoing resolution of appellant's underlying claim on direct appeal requires rejection of his current claim, *i.e.,* because we previously determined that appellant suffered no prejudice by the trial court's seating of juror Spicer, appellant is hard-pressed to argue now that a deficient performance by direct appeal counsel precluded the Court from reaching an opposite result. Although appellant inappropriately argues that *Vasquez* prohibits employing a harmless-error analysis in jury discrimination claims, this discrete portion of the U.S. Supreme Court's opinion garnered only three votes and controls nothing. *Vasquez,* 474 U.S. at 264, 106 S.Ct. 617. More importantly, *Vasquez* is inapposite, as it is a case where members of the defendant's own race were excluded from a grand jury. *Id.* at 256, 106 S.Ct. 617. Here, there are no allegations that the trial court's action amounted to racial discrimination and we know of no authority, and appellant does not cite any, providing that a defendant has an unfettered constitutional right to exercise a peremptory challenge to a juror. Appellant does not offer any other argument implicating the prejudice prong of his ineffectiveness claim, but rather baldly states that he was prejudiced by direct appeal counsel's failure to make particular arguments. Notably, though, not one of the arguments that appellant says his direct appeal counsel should have made would have disputed this Court's prior finding that appellant suffered no prejudice

when juror Spicer was placed on his jury.[7] Consequently, appellant's first ineffectiveness claim fails.

## B. Prosecutorial Misconduct[8]

Appellant next claims that his direct appeal counsel was ineffective for failing to raise his trial counsel's tolerance of the prosecutor's repeated prejudicial conduct which violated his federal due process, Sixth Amendment, and Fourteenth Amendment rights, as well as his state constitutional rights under Article 1, Sections 9 and 13 of the Pennsylvania Constitution. Appellant argues that the prosecutor impermissibly: (1) presented victim impact testimony and made related arguments concerning that testimony to the jury; (2) offered conjecture and opinion; (3) commented during witness testimony; and (4) withheld impeachment evidence concerning Commonwealth witnesses in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Appellant asserts that his trial counsel should have objected or asked for a mistrial and, thereafter, appellate counsel was ineffective for failing to raise trial counsel's omissions on direct appeal. Moreover, appellant contends that appellate counsel was ineffective for not arguing trial counsel's failure to investigate impeachment facts about the Commonwealth's witnesses.

The Commonwealth denies that any of appellant's claims have merit, arguing that they are nothing more than waived claims recast in the guise of boilerplate ineffectiveness claims. The Commonwealth argues that: (1) the victim's mother was properly called to testify that the victim was a life-in-being; (2) the prosecutor did not insert his personal opinions at trial

7. Indeed, the record gives no indication that juror Spicer would be unfair. When discussing juror Spicer's responses to her jury questionnaire, the trial court noted that she gave no response that signaled she would be biased and appellant's trial counsel did not dispute that assessment. N.T. 7/5/1995 at 33. It is also worth noting that juror Spicer was excused from the courtroom while appellant's counsel articulated his objection to her, *id.* at 27, and, therefore, appellant's specific objections to her could not have caused her to develop a bias against him.

8. Appellant's claim III.

or argue extra-record evidence; and (3) the prosecutor did not violate *Brady* with regard to any witness.

The PCRA court found that the prosecutor's conduct did not deprive appellant of a fair trial, since his remarks were fair comment and proper argument on the evidence of record. Moreover, the PCRA court reasoned that the trial court's jury instructions were sufficient to guard against any prejudice to appellant. As to appellant's associated *Brady* claims, the court below found that the proposed impeachment of Commonwealth witnesses Monique Wylie and Edgar Clarke would not have altered the outcome of the case and that the Commonwealth was unaware of impeachment evidence related to its witness Ramon Burton.

In order to obtain relief for alleged prosecutorial "misconduct," a petitioner must first demonstrate that the prosecutor's action violated some statutorily or constitutionally protected right. *See, e.g., Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986) (using peremptory challenges to exclude jurors based on race violates the Equal Protection Clause); *Brady,* 373 U.S. at 86, 83 S.Ct. at 1196 (nondisclosure by a prosecutor of exculpatory material violates due process). Consistently, we have held that prosecutorial misconduct does not occur unless the prosecutor's challenged comments had the unavoidable effect of prejudicing the jury with such animus toward the defendant as to render it incapable of fairly weighing the evidence and arriving at a just verdict. *Commonwealth v. Chmiel,* 585 Pa. 547, 889 A.2d 501, 542 (2005); *Commonwealth v. Hawkins,* 549 Pa. 352, 701 A.2d 492, 503 (1997), *cert. denied,* 523 U.S. 1083, 118 S.Ct. 1535, 140 L.Ed.2d 685 (1998). A prosecutor does not engage in misconduct when his statements are based on the evidence or made with oratorical flair. *Commonwealth v. Marshall,* 534 Pa. 488, 633 A.2d 1100, 1110 (1993). Additionally, a prosecutor must be permitted to respond to arguments made by the defense. *See Hawkins,* 701 A.2d at 503; *Commonwealth v. Clayton,* 516 Pa. 263, 532 A.2d 385, 396 (1987), *cert. denied,* 485 U.S. 929, 108 S.Ct. 1098, 99 L.Ed.2d 261 (1988). With these rules in mind, appellant's specific contentions of

prosecutor misconduct, which underlie his layered ineffectiveness claims, and the Commonwealth's pointed responses will be addressed *seriatim.*

### 1. Victim Impact Testimony

Appellant's first claim relates to the Commonwealth's presentation of testimony from the victim's mother, which he argues was both inflammatory and prohibited victim impact evidence during the guilt phase. Appellant further asserts that the prosecutor exacerbated the alleged inappropriate testimony during his closing argument in the guilt phase and thereby destroyed the jurors' objectivity.

The Commonwealth deems appellant's claim to be frivolous under *Commonwealth v. Miller,* 560 Pa. 500, 746 A.2d 592, 602 (2000), because the victim's mother properly testified that the victim was a life-in-being and that she conclusively identified him. As to the prosecutor's closing remarks, the Commonwealth simply explains that there is nothing improper about asking a jury to fulfill its duty to reach a just verdict, Commonwealth's Brief at 22 (citing *Commonwealth v. Ragan,* 538 Pa. 2, 645 A.2d 811, 829 (1994)).

As defined by our Sentencing Code, victim impact evidence is information concerning the victim and the impact the victim's death has had on the family of the victim. 42 Pa.C.S. § 9711(a)(2). We held in *Miller* that there was no error in a murder victim's mother testifying during the guilt phase that her child was a life-in-being and that she had identified the body of her deceased child. 746 A.2d at 602. Additionally, in *Ragan,* we stated that it is a prosecutor's job to argue that failure to convict a defendant would be a "failure of justice." 645 A.2d at 829.

■ The entire examination of the victim's mother, Naomi Collier, consisted of five questions and answers:

PROSECUTOR: Ma'am, Did you know William Lloyd?

MS. COLLIER: Yes.

PROSECUTOR: Who was he?

MS. COLLIER: My son.

PROSECUTOR: Before November 22nd, 1993, was Mr. Lloyd alive and well?

MS. COLLIER: Yes.

PROSECUTOR: When was the next time that you had seen your son?

MS. COLLIER: He was dead.

PROSECUTOR: Did you identify his body at the office of the medical examiner?

MS. COLLIER: Yes.

N.T. 7/11/1995 at 84–85. Ms. Collier's answers to the prosecutor's questions were never more than three words and were far from the highly emotional testimony that appellant characterizes in his brief. Nor did they involve victim impact. Since *Miller* establishes the appropriateness of the prosecutor's questions and Ms. Collier clearly said nothing to unfairly stoke the passions of the jury, appellant's claim that the prosecutor committed objectionable "misconduct" fails, and his attendant layered ineffectiveness claim is without merit.

■ Likewise, there was no misconduct in the prosecutor's closing remarks which obliged appellant's prior counsel to object. Appellant objects to the prosecutor's statement that:

I am not going to take up any more of your time. You have seen these people here and you saw the victim's mother take the stand. I hope you can send her home with a sense of justice and that justice has been done. She has to go back to that neighborhood, too. I am urging you to use your common sense because when you think about everything, of why he did what he did. Do not let him out of this one.

N.T. 7/12/1995 (p.m.) at 49. This allegedly impermissible statement contains no mention of how the victim's mother's life has been altered by her son's death, but rather merely asks the jury to give the victim's mother a just verdict by declaring appellant guilty. The prosecutor's statement did not amount to impermissible victim impact argument. Nor is there anything in the argument that could be said to so destroy the objectivity of the jury that counsel were obliged to

object. Because this individual claim of prosecutor miscon-
duct has no more merit than the first, appellant cannot
establish his primary layered ineffectiveness claim. *McGill,*
832 A.2d at 1023.

## 2. *Closing Argument*

■ In advancing his second list of claims of prosecutor
misconduct, appellant labels several statements that the prose-
cutor made during his closing arguments as prejudicial.
First, appellant quotes the prosecutor's statement that: "I
have the evidence to speak for me and that is why I am not
going to take long," N.T. 7/12/1995 (p.m.) at 28, as an improper
expression of the prosecutor's personal belief or opinion as to
appellant's guilt.

The Commonwealth responds that it was proper for the
prosecutor to ask the jury to consider the evidence and, in
addition, it was a fair response to defense counsel's suggestion
that district attorneys may say anything to get a guilty
verdict.

Appellant's underlying argument is meritless because the
prosecutor merely stated that his case relies simply upon the
evidence placed before the jury. The prosecutor did not say
that he personally believed appellant was guilty, but rather
that the evidence showed appellant's guilt. *See Marshall,* 633
A.2d at 1110 (prosecutor's arguments based on the evidence
are proper). If such arguments were improper, the Common-
wealth would be hard-pressed to make any argument in
response to the defense.

■ Next, appellant claims the prosecutor improperly
"vouched for himself" during closing arguments and violated
appellant's "constitutional right to cross-examine his own
statements," Appellant's Brief at 20, when the prosecutor
stated: "Well, if I were that type of a guy, you would probably
see about ten eyewitnesses up there all having been paid in
full." N.T. 7/12/1995 (p.m.) at 30. The Commonwealth replies
that the prosecutor's remark was a fair response to defense
counsel's accusation that the prosecutor would "do anything

and say anything in order to engineer a guilty verdict in a case." N.T. 7/12/1995 (p.m.) at 5. We agree that the prosecutor's statement was a fair response to defense counsel's largely improper and baseless implication that the prosecutor would behave unethically, or indeed, criminally, in order to win cases.

Appellant also claims that the prosecutor impermissibly "wrapped himself in 'cloak of state authority'," Appellant's Brief at 20, when he said, ".... People are scared to death. That's [r]ule [n]umber [o]ne. They are scared to death in th[is] City." N.T. 7/12/1995 (p.m.) at 32. Appellant contends that the prosecutor's comment compelled the jury to sentence appellant to death.

The Commonwealth, however, portrays the prosecutor's remark as a proper synopsis of witness testimony and correctly notes appellant's quotation is taken out of context.

The prosecutor's full statement was:

As dictated to you by Ruth Beverly, as an example of what happens in this society, people are scared to death. That's rule number one. They are scared to death in this city, as Ruth Beverly is scared to death. How scared is she? She moved out of here. Does a person do that when they are lying or telling the truth?

*Id.* Ms. Beverly, an eyewitness to the murder, testified that she moved out of Philadelphia after receiving threats from one of appellant's witnesses. N.T. 7/10/1995 at 146–47. The prosecutor asked the jury, based on this testimony, to contemplate whether a person who was lying about witnessing a murder—defense counsel accused her of lying—would flee from her home. When viewing the prosecutor's statement in responsive context, it prompted the jury to weigh Ms. Beverly's credibility in light of the evidence. The prosecutor did not seek to "wrap himself in a cloak of authority." This claim is nonsensical.

Fourth on appellant's list is a claim that the prosecutor did not abide by the court's instruction and argued extra-record evidence, which violated his Confrontation Clause

rights under the Sixth and Fourteenth Amendments, in the following exchange:

PROSECUTOR: I am telling you right now that this man, Samuel Carson, was not in the house the second time. I never maintained that.

DEFENSE COUNSEL: Objection. The personal opinion of the prosecutor has nothing to do with this case, Your Honor.

PROSECUTOR: I just said he was not in the house.

THE COURT: Stick to the record.

PROSECUTOR: He wasn't in the house. I never maintained that. I will maintain, however, ladies and gentlemen, that he was right outside. A lookout because these men came back in the house.

N.T. 7/12/1995 (p.m.) at 42.

The Commonwealth maintains that the prosecutor's statement was a fair response to defense counsel's accusation that the prosecutor had given the jury incorrect information. Moreover, the Commonwealth notes that the record supports its theory of the events that preceded the murder.

The prosecution's theory of the case was that, prior to the murder, appellant came with two other men to rob a drug house in South Philadelphia and acted as a lookout outside of the home during the robbery. One of the men in the home at the time of the robbery, Edgar Clarke, testified that two men, other than appellant, entered the house and committed the robbery. N.T. 7/7/1995 at 81–85. Outside of the home a short time later, Ramon Burton testified to engaging in a shootout with appellant and two other men. N.T. 7/10/1995 at 63–67. Mr. Burton's and Mr. Clarke's testimony provided record support for the prosecution's argument that appellant was a lookout. Furthermore, the prosecutor's closing remarks were a fair response to the defense counsel's closing argument, in which he claimed that the prosecutor's theory was "mistaken or disingenuous":

What did [the prosecutor] say in his opening? He said at one point—and I wrote it down—the three came back and

robbed Clark [sic]. Now, we know that that's not true. Either he made a mistake or he was being disingenuous. I don't know. And I'm not here to sit in judgment over him, but what I am saying to you, that he gave you wrong information, because we heard from Clark [sic].

N.T. 7/12/1995 (a.m.) at 72. Because the prosecutor's closing was both a fair response to this specific portion of defense counsel's closing argument and was based on the evidence presented at trial, appellant's claim that counsel was obliged to object has no merit.

 In appellant's next claim, he contends that the prosecutor improperly vouched for his witness, Ms. Beverly, when he said:

If you are going to set a man free for having shot at someone seven times, and put one bullet in his brain, just remember please, that I presented to you a witness who had absolutely no motive to come in here and lie to you.

N.T. 7/12/1995 (p.m.) at 40. The Commonwealth argues that the prosecutor's remark was a response to defense counsel's closing, during which he repeatedly attacked Ms. Beverly's credibility. The Commonwealth is correct.

In his closing argument, defense counsel spent a considerable amount of time attacking Ms. Beverly's explanation for waiting so long to come forward and speak to the police. *Id.* at 11–18. Appellant personally sought to attack Ms. Beverly's testimony when he took the witness stand, accusing her of having sex with him for drugs and giving the police a statement in exchange for drugs. *E.g.*, N.T. 7/11/1995 at 141–43; 160–61. Clearly, based on appellant's direct attacks on Ms. Beverly, it was fair for the prosecutor to argue in reply that his witness had no motive to lie. Counsel was not obliged to object.

 Sixth on appellant's list is a claim that it was inflammatory for the prosecutor to speak about his own family and to supposedly provide his opinion about appellant's alibi witnesses. The prosecutor stated:

You had two alibi witnesses who came in here. Naturally, they are related to the defendant. I am going to give them this. I am sure they care very much about him. I am not taking anything away from them. The two witnesses, I am sure, they love this man. I am sure they love him as much as I love my children and my wife and as much as you love your loved ones. And if anyone of them is locked up for a crime, you better believe that I am going to go tell somebody that this person was with me that night. Aren't you going to do that?

N.T. 7/12/1995 (p.m.) at 44. Appellant asserts that these comments introduced extra-record evidence prejudicial to him, including information about the prosecutor's family and the fact that appellant was in jail during trial.

The Commonwealth argues that it was entirely proper to ask the jury to infer from the evidence that appellant's alibi witnesses had a motive to lie. As to the prosecutor's comments about his own family, the Commonwealth argues that the prosecutor was drawing a credibility analogy in order to focus the jury on reasonable inferences that flowed from the evidence.

Contrary to appellant's assertions, the prosecutor did not give an opinion about the truthfulness of appellant's alibi witnesses nor did he state that appellant was currently in jail. The prosecutor's comments were simply a hypothetical example to illustrate something about human nature, to ask the jury to think about what actions a person might take to exonerate an accused loved one arrested for a crime and, accordingly, what motivations appellant's alibi witnesses may have had when testifying for him. It was not misconduct to pose such an analogy, much less an event that obliged counsel to object.

In addition, even supposing the prosecutor's comments were improper, appellant's own testimony about the events that evening did more to undermine the credibility of his alibi. Appellant claimed that he was chased home by a gun-wielding man on the night of the murder, but he said that

he did connect the gunshots he heard a few minutes later to that individual. He further claimed that he never told his father or girlfriend about the man chasing him with the gun; that he remembered exactly what he did the day of the murder, when the first time he was questioned about his activities was a month and a half later; and that he never talked to his two alibi witnesses, his father and his girlfriend who was pregnant with his child, about his murder case. N.T. 7/11/1995 at 151, 153, 157. In light of appellant's own testimony, which weakened his alibi witnesses' credibility, the prosecutor's exploration of human nature was not prejudicial.

Next, appellant argues that the prosecutor violated the "golden rule" and placed the jury in the shoes of the victim when he explained the doctrine of transferred intent. The prosecutor explained: "Regardless of whether you hit your target, you are still liable for that person's death to the same degree as if you had hit the target. If I[am] aiming at Juror Number Two and I hit Juror Number Twelve, I am still liable to the same degree." N.T. 7/12/1995 (p.m.) at 47–48. The Commonwealth dismisses appellant's argument as odd, because appellant never explains how the prosecutor violated the "golden rule" with this comment and a prosecutor is permitted to make accurate statements on applicable law to the jury. We agree. Given that the Commonwealth accurately characterized this Court's precedent on the doctrine of transferred intent, *Commonwealth v. Rios*, 546 Pa. 271, 684 A.2d 1025, 1034 (1996), *cert. denied*, 520 U.S. 1231, 117 S.Ct. 1825, 137 L.Ed.2d 1032 (1997); *see Commonwealth v. Gwaltney*, 479 Pa. 88, 387 A.2d 848, 850 (1978), appellant has failed to identify anything objectionable in the prosecutor's summation of the law. Therefore, the issue lacks merit.

■■ Eighth on appellant's list is a claim that the prosecutor introduced extra-record evidence when declaring appellant had committed other crimes, but received no punishment. The prosecutor stated in his closing:

I am urging you to use your common sense because when you think about everything, of why he did what he did, do not let him out of this one. Don't let him out of this one,

Ladies and Gentlemen. Don't give him a slap on the wrist. Don't let him out of this one. No, No, No. First degree murder, Ladies and Gentlemen. The evidence tells you it's first degree murder and nothing, nothing less.

N.T. 7/12/1995 (p.m.) at 49. The Commonwealth reads this argument as the prosecutor's promotion of a first-degree murder verdict and notes the irony in appellant's argument, as appellant freely admitted he was a drug dealer on direct examination.

██ Again, appellant has misconstrued the prosecutor's closing remarks, since the prosecutor never mentioned in his closing that appellant had committed other crimes or had been lightly punished for past wrongdoing. The prosecutor's focus on this "one" does not ineluctably suggest that there were "other" crimes, much less crimes for which he escaped punishment. Moreover, trial counsel was not constitutionally obliged to assume some nefarious intention behind the remarks— particularly since counsel was there, and heard how they were delivered. Finally, appellant cannot show prejudice from the argument under his own theory, since appellant himself repeatedly acknowledged that he sold drugs: "I am not a killer. I am drug dealing [sic]." N.T. 7/11/1995 at 106; *e.g., id.* at, 113, 114, 115, & 118.

██ The next claim on this list of complaints is that the prosecutor argued extra-record evidence, thereby painting appellant as a callous criminal, by maintaining that appellant's gun jammed and that he then returned to the scene of the crime to fire more shots. Conversely, the Commonwealth finds no harm in the prosecutor's conjecture during his closing because a prosecutor is permitted to make reasonable inferences from the record evidence.

Here, the murder weapon was never found and the prosecutor argued that: (1) people who commit murder do not keep the fatal weapon; and (2) appellant may have thrown the gun away if it were defective. N.T. 7/12/1995 (p.m.) at 34.[9] The

9. Also, Ms. Beverly's testimony arguably provided a factual basis for the prosecutor's inference that the gun jammed, as she testified to appellant

prosecutor merely offered reasonable explanations for why the murder weapon could not be found, a relevant point since it could not be produced at trial. Trial counsel was not obliged to object.

 In his penultimate claim, appellant asserts that the prosecutor disparaged defense counsel's integrity and prejudiced him with the following argument:

> I was also very interested to see how outraged Mr. Greene got. How self-righteous he got up here, the way he pounded the desk, the way he pretended that this was the most outrage[ous] miscarriage of justice he had ever seen in the course of his life, until his next case comes along. What was he so outaged [sic] about? There is an eyewitness to a murder? Okay. He tried to poke holes in the case, but why does he act outraged? Because he has nothing else to go on, Ladies and Gentlemen.

*Id.* at 30–31. The Commonwealth denies the efficacy of appellant's claim considering that defense counsel first personalized matters by attacking the prosecutor's morality. In particular, the Commonwealth notes that defense counsel stated in his closing that district attorneys sometimes may "step out of bounds and will do anything and say anything in order to engineer a guilty verdict in a case." *Id.* at 5.

 While we certainly do not condone reciprocal—or initial—assaults on counsel's character, we have previously recognized that not every unwise remark made by an attorney amounts to misconduct or warrants the grant of a new trial. *E.g., Commonwealth v. Faulkner*, 528 Pa. 57, 595 A.2d 28, 38–39 (1991), *cert. denied*, 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992); *Commonwealth v. Goosby*, 450 Pa. 609, 301 A.2d 673, 674 (1973). A new trial should only be granted where the remark was prejudicial to the jury such that it was incapable of rendering a true verdict. *Chmiel*, 889 A.2d at

> making particular motions with his hands as he was firing. N.T. 7/10/1995 at 137. While the prosecutor asked Ms. Beverly whether it looked like appellant was "pulling back something," she answered that she could not tell and mimicked the hand gesture that she saw. That gesture, unfortunately, is not further described in the record. *Id.*

542. In this instance, the remarks were reciprocal and personal to each lawyer. There was nothing particularly prejudicial and counsel would have been hard-pressed to object, having broached the subject himself.

Taking each of the prosecutor's comments together, appellant last contends that the prosecutor tainted the trial with such unfairness as to render his conviction a denial of due process. Appellant, however, is not entitled to relief on his cumulative claims of prosecutor misconduct when none of his individual claims entitles him to relief. *Commonwealth v. Williams*, 532 Pa. 265, 615 A.2d 716, 721 (1992).

### 3. Comments to Examining Witnesses

■ Appellant next claims that the prosecutor unacceptably bolstered the testimony of Commonwealth witness Ms. Beverly, the sole testifying eyewitness to the crime, as well as portraying her as a victim of the shooting that killed William Lloyd. Specifically, appellant objects to the prosecutor's statement during the cross-examination of Commonwealth witness Monique Wylie: [10]

DEFENSE COUNSEL: Tell the members of the jury why you went to see Raymon [sic] Burton?

MS. WYLIE: To buy narcotics from him.

DEFENSE COUNSEL: To buy narcotics from him. And how often did you buy narcotics?

THE COURT: What's the relevancy of that question?

DEFENSE COUNSEL: Judge, the District Attorney is going to call Mr. Burton as a witness, and when he calls Mr. Burton as a witness and I have an opportunity to cross examine you will certainly see the relevancy.

PROSECUTOR: I don't care if the guy [Ramon Burton] does narcotics. Everybody in the case did with the exception of the eyewitnesses.

10. In the record, we find Ms. Wylie's name is alternately spelled as: "Willie," "Wiley," and "Wylie." We refer to her as "Ms. Wylie," as this is the spelling she affixed her signature to in a signed declaration that appellant submitted with his PCRA petition.

N.T. 7/10/1995 at 29–30. The Commonwealth argues that the prosecutor's comment was based on the established evidence in the case and that appellant freely admitted that he was a drug dealer when he testified in his own defense.

Appellant makes a leap in logic in characterizing the statement above as bolstering of Ms. Beverly's testimony. First, the prosecutor's statement was made in response to a discussion initiated by the trial court because defense counsel's line of questioning seemed irrelevant. Second, Ms. Beverly had yet to testify and, when she did, she admitted on cross-examination to having been addicted to narcotics in the past. *Id.* at 154–56. Ms. Beverly's admission effectively eviscerated any supposed validation of her testimony by the prosecutor and, as a result, could not have prejudiced appellant by rendering the jury incapable of reaching a fair verdict. In any event, counsel cannot be faulted for failing to forward this strained interpretation.

■ Appellant also accuses the prosecutor of painting Ms. Beverly as a victim of the shooting that killed William Lloyd. The Commonwealth does not respond to this specific sub-claim. During cross-examination by defense counsel, Ms. Beverly stated that "bullets don't have no name on it so I stayed down there until after I heard the gun fire." N.T. 7/10/1995 at 175. The trial court then commented, "[t]hat's what I would be concerned about," and the prosecutor responded, "I'm concerned about those too." *Id.* Although appellant frames this exchange as objectionable vouching for Ms. Beverly's testimony by the trial court and prosecutor, the irrelevant comment by the prosecutor does not legitimize a portion of Ms. Beverly's testimony or even comment on testimony directly relevant to appellant's guilt. The prosecutor's comment, albeit unnecessary, merely verbalized humanity's universal fear of gunfire. As such, trial counsel was not obliged to object.

■ Appellant next complains that the prosecutor "sought to ingratiate himself at Appellant's expense," Appellant's Brief at 24, by stating: "[s]ir, you are [sic] man with an IQ of 120 to

130, which is higher than mine." N.T. 7/11/1995 at 151. The Commonwealth questions how such a statement would help the prosecution, as appellant does not explain why the prosecutor would seek to "fawn" in front of the jury by saying he was less intelligent than appellant, and argues that the prosecutor merely wished to demonstrate the implausibility of appellant's story. Commonwealth's Brief at 29–30.

Appellant, yet again, omits the trial context from his brief, as this allegedly unfitting statement was followed by the prosecutor asking with respect to appellant's testimony:

> If a man is chasing you with a gun a block and a half from your house, and you run in your house and you hear a series of gunshots and your first reaction is that it's just a random firing and not coming from the corner. Your first immediate reaction is not that it is coming from the corner, but it's random?

N.T. 7/11/1995 at 151. This question was an appropriate follow-up to appellant's earlier testimony on direct examination that his IQ was "in the range of 125 or 130," *id.* at 116, and his recollection of hearing random gunshots on the night of the murder, but which he testified he did not attribute to being chased by an armed man a short time prior to the shooting. *Id.* at 150. In the context of appellant's implausible account and self-proclaimed intelligence, the prosecutor's statement was nothing more than oratorical flair aimed at persuading the jury not to credit appellant's version of events. Counsel was not obliged to object to the prosecutor's statement.

Since each of these claims have no validity, appellant's overarching layered ineffectiveness claims, which are reliant on the independent merit of the claims of prosecutor impropriety, also fail. *McGill,* 832 A.2d at 1023.

### 4. Brady Violations

Appellant next claims that he was prejudiced under *Brady* when several pieces of evidence were not disclosed to him by the Commonwealth. Before addressing appellant's specific

544

claims and the Commonwealth's respective responses, we explain the relevant case law.

A *Brady* violation has occurred when: (1) the prosecutor has suppressed evidence; (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant; and (3) the suppression prejudiced the defendant. *Collins*, 888 A.2d at 577–78; *Commonwealth v. Paddy*, 569 Pa. 47, 800 A.2d 294, 305 (2002). The evidence must be material, such that there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the proceeding would have been different. *Commonwealth v. Burke*, 566 Pa. 402, 781 A.2d 1136, 1141 (2001). The prosecutor's duty to turn over exculpatory or impeachment evidence to the defense exists even in the absence of a defense request for such material, *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976), and includes evidence found in the police files of the same government bringing the prosecution. *Commonwealth v. Lambert*, 584 Pa. 461, 884 A.2d 848, 853 (2005); *Burke*, 781 A.2d at 1142 (citing *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). No *Brady* violation can occur where the evidence is available to the defense through non-governmental sources, or, with reasonable diligence, the defendant could have discovered the evidence. *Commonwealth v. Morris*, 573 Pa. 157, 822 A.2d 684, 696 (2003); *Paddy*, 800 A.2d at 305.

### a. Monique Wylie

First, appellant complains that the prosecution pressured Monique Wylie to testify and a police officer paid her for her statement. Appellant offers a signed declaration from Monique Wylie,[11] stating that she received money from Police Officer Glen Keenan for providing him information about appellant, as proof the prosecutor must have withheld *Brady*

11. Appellant erroneously refers to the post-trial statements from Commonwealth and defense witnesses as affidavits, even though they have not been confirmed by oath before a judicial officer having the authority to administer that oath. *See* BLACK's LAW DICTIONARY 58 (7th ed.1999); *Commonwealth v. Brown*, 582 Pa. 461, 872 A.2d 1139, 1168 (2005) (Castille, J., concurring).

material from him. The Commonwealth disputes that Ms. Wylie's recantation can form the basis of a *Brady* claim.

Even if Ms. Wylie's signed statement were true, the evidence does not help appellant unless such information was within prosecution or police files and could only be found there. Appellant fails to assert, however, that there was any evidence in police or prosecution files relating to any payments made to Ms. Wylie. Furthermore, appellant does not explain why it was only possible for him to obtain this alleged information after trial. Accordingly, appellant is not due relief under this claim.

### b. Edgar Clarke

Appellant's second claim under *Brady* is that Mr. Clarke gave the police two different statements, but the prosecution only divulged one. This claim, like the last is based on a signed declaration, this time one obtained from Mr. Clarke. In the declaration, Mr. Clarke states that he first told police he knew nothing about the crime and then, in a break in the questioning at the police station, he saw the wife of his friend Ramon Burton in the station. Edgar Clarke Signed Declaration at 1. Because Mr. Clarke was concerned with what the police might already have been told by his friend's wife and the police told him that they knew he was present at the scene of the crime, he states that he then told the police what he knew about the night of William Lloyd's murder. *Id.* at 1–2.

The Commonwealth argues that Mr. Clarke only provided one statement to the police.

The very words of Mr. Clarke's declaration do not support appellant's claim that he gave the police two statements, but instead reveal that he only signed one. Moreover, even assuming that Mr. Clarke's signed statement counts as two, there is no evidence that soliciting this fact at trial would have produced another verdict. The evidence against appellant was ample, as the Commonwealth presented Ms. Beverly's testimony that appellant committed the shooting and Mr. Burton testified that appellant fired his gun at him a few minutes before the murder. Furthermore, it is not clear that Mr.

Clarke's alleged initial denial to the police that he knew nothing would have damaged his credibility considering that he had been selling drugs near the time of the murder and would have been understandably reluctant to divulge such information to the authorities. N.T. 7/7/1995 at 91. Appellant's claim is without merit.

### c. Ramon Burton

Mr. Burton testified at appellant's trial that on the night of William Lloyd's death he engaged in a gun battle with appellant and one of appellant's cohorts, whom Mr. Burton wounded. Appellant claims that the prosecutor withheld evidence that appellant could have used to impeach Mr. Burton at trial and he disputes the Commonwealth's argument that Mr. Burton had no motive to lie. First, appellant alleges that Mr. Burton had a 1992 drug conviction under his alias, John Smith, and was sentenced to one year of probation. Appellant asserts that this sentence had not been completed at the time of trial and, as a result of the non-disclosure, appellant was unaware that Mr. Burton had a potential motive to testify favorably for the Commonwealth. Moreover, appellant asserts that he should have been informed that Mr. Burton had an unregistered weapon on the night of the murder, that he was never prosecuted for carrying that weapon, that he did not supply his business records to the Internal Revenue Service (IRS), and that he was in the United States illegally. Appellant's Brief at 26.

The Commonwealth counters that it could not have disclosed an Immigration and Naturalization Service (INS) file that did not exist at the time of trial and, even if it did exist, the defense would have had equal access to it. While the Commonwealth does not specifically respond to appellant's allegation that appellant should have been told of Mr. Burton's 1992 conviction under an alias, it argues that the jury probably did not believe a drug dealer such as Mr. Burton would file his taxes or register his firearm. The PCRA court found that appellant did not demonstrate that the Commonwealth knew of Mr. Burton's drug conviction under his alias and could not

be responsible for producing an INS file that had not yet been created.

We see no error in the PCRA court's rejection of this claim. When Mr. Burton testified at appellant's trial that he was selling drugs out of his business, N.T. 7/10/1995 at 81–83, the jury could have reasonably surmised that Mr. Burton was not filing the proper paperwork with the IRS, nor would they have been surprised to learn that an admitted drug dealer was carrying an unregistered firearm. As to Mr. Burton's immigration status, appellant offers an INS record from 2000, which would not have been available at trial given that it was made five years after appellant was found guilty. *See* INS Record of Ramon Burton. Any immigration records that existed in 1995 for Mr. Burton were not in the exclusive possession of the prosecution. Respecting Mr. Burton's drug conviction, under an alias, appellant has not shown that the Commonwealth knew of that conviction, or that it was in a better position than he to uncover it. Instantly, appellant has not demonstrated that any of the evidence of purported impeachment material on Mr. Burton was in the exclusive knowledge and possession of the Commonwealth. Equally importantly, he has not shown that the outcome of the trial would have differed if only this mere impeachment material had been introduced. Accordingly, his *Brady* claim fails as meritless.

### 5. *Failure to Investigate and Discover Impeachment Evidence*

At the end of his list of prosecutorial misconduct complaints, appellant inserts three sentences which argue that his trial counsel was ineffective for neglecting to investigate and discover impeachment evidence on Ms. Wylie, Mr. Burton, and Mr. Clarke and, thereafter, appellate counsel was ineffective for failing to argue trial counsel's ineffectiveness. Appellant's Brief at 27. This boilerplate argument fails as appellant does not mention what specific impeachment evidence his trial counsel failed to adequately investigate and discover, but instead cites to trial counsel's "declaration" in which he professes his failure to adequately impeach the aforementioned

witnesses on various subjects. Appellant's Brief at 27. Appellant's thin argument runs counter to his *Brady* claims, in which he contends that certain impeachment evidence was in the exclusive possession of the prosecution. More crucially, we cannot evaluate his insubstantial claim, as we are left to guess what relevant and material evidence trial counsel should have uncovered and how this evidence was so easily within his grasp.

## C. Misconduct of Trial Court[12]

### 1. *Alleged Bias During Questioning of Witnesses*

#### a. Ruth Beverly

Appellant accuses the Honorable Paul Ribner, the judge presiding over his trial, of impermissibly bolstering the testimony of Ms. Beverly by answering questions for her and coaching her responses. According to appellant, the trial court essentially told the jury that he found Ms. Beverly's testimony credible and, thereby, usurped an exclusive function of the jury. He claims prior counsel were ineffective for failing to object to the trial court's behavior. Appellant's specific citations will be discussed *infra.*

The Commonwealth denies that appellant's cited instances of alleged judicial misconduct have any merit and notes that appellant never suggests what action his trial counsel could have taken to cure the trial court's bias. The Commonwealth states that the trial court provided appellant's trial counsel wide latitude to question Ms. Beverly, but the trial court was forced to curb defense counsel's questioning when counsel began to badger the witness.

The PCRA court, without addressing any one of appellant's individual claims of impartiality toward witnesses, found that the trial court had not exhibited any bias during the trial. Moreover, the PCRA court ruled that even if the trial court had overstepped its bounds, any potential prejudice was cured by instructions to the jury that they were to disregard any

**12.** Appellant's claim IV.

perceived bias that the trial court might have exhibited and render their own decisions as to witness credibility.

■ The first portion of the transcript appellant cites to support his claim involves the end of defense counsel's repetitive cross-examination of Ms. Beverly, wherein Ms. Beverly displayed obvious distain for defense counsel's tactics and the trial court had told her to wait until defense counsel was finished asking a question before beginning to answer it. N.T. 7/10/1996 at 167–68. Defense counsel questioned Ms. Beverly as to how long she was lying on her stomach when the trial court volunteered, "[u]ntil she got up again." *Id.* at 174. Defense counsel then asked the question again and Ms. Beverly answered it. *Id.*

Ms. Beverly had already testified on direct examination that she was lying on the ground until the police reached the scene, *id.* at 145; and on cross-examination, a few moments before the trial court's comment, she said that she stayed on the ground until the police arrived at the scene, *id.* at 169–70. The record reveals that the trial court continually permitted defense counsel to ask the same question more than once, but apparently, the court eventually lost its tolerance for defense counsel's style of questioning and, ungracefully in this instance, attempted to curb the repetitive questioning. Although it would have been better not to employ apparent sarcasm, Ms. Beverly was not hindered in answering the question repeatedly asked, and appellant has not shown that the exchange was so prejudicial that counsel was obliged to object.

■ Appellant next cites as improper a comment a few lines later in the transcript, when the trial court commented that it, too, would be concerned about flying bullets in response to Ms. Beverly's explanation of why she did not recall how long she was lying on the ground. *Id.* at 175. The trial court's statement, albeit unnecessary, was harmless.

■ In the third instance of alleged improper conduct, appellant accuses the trial court of coaching Ms. Beverly's answers. Specifically, appellant cites the trial court's state-

ment that Ms. Beverly did not know how much time had elapsed between the shooting of William Lloyd and a prior series of gunshots at a nearby location. This claim also has no merit.

The court's comment occurred after defense counsel asked Ms. Beverly for the third time how much time had elapsed between two series of gunshots. *Id.* at 175–76. Ms. Beverly had already answered the question twice, stating she was unsure how much time had gone by, before the trial court accurately summarized, "She doesn't know." *Id.* at 176. Ms. Beverly then stated, "I don't know." *Id.* Certainly, Ms. Beverly was not "coached" in an answer she already provided twice. It was not judicial "misconduct" for the trial court to step in here.

### b. Anthony Troy Powell

Next, appellant claims that the trial court sought to discredit defense witness Anthony Powell, who claimed that he was with Ms. Beverly when the gunfight began a few blocks from where William Lloyd was murdered. Appellant argues that the trial court's partiality was shown in his questioning of Mr. Powell. Appellant cites the following passages:

THE COURT: Was there a reason why you wanted to say something about [Ms. Beverly], why you were trying to get some thought across to the jury?

MR. POWELL: No, nothing like that.

THE COURT: Do you have some reason why you wanted to say something about [Ms. Beverly's] conduct?

MR. POWELL: No, Your Honor.

THE COURT: You just blurted it out because you wanted to blurt it out.

THE WITNESS: Yeah, I guess you could say that.

THE COURT: Alright, go ahead.

N.T. 7/12/1995 (a.m.) at 12–13. Also, appellant cites:

PROSECUTOR: Sir, sir, you were asked did you see [Ms. Beverly at the murder scene].

MR. POWELL: Yes.

PROSECUTOR: And you said no.

THE COURT: Wait a minute. You say she probably wasn't there because, otherwise, they would have taken her down to homicide like they took you down.

MR. POWELL: They sure did. They sure picked—.

THE COURT: Maybe you looked suspicious and she didn't. There are a lot of reasons why they would have taken you and not her; is that right?

MR. POWELL: We were all together.

*Id.* at 17–18.

While a trial judge should normally leave questioning of witnesses to counsel, justice may require that a trial judge ask questions when absurd, ambiguous, or frivolous testimony is given or testimony is in need of further elucidation. *See Commonwealth v. Roldan,* 524 Pa. 366, 572 A.2d 1214, 1215 (1990) (citing *Commonwealth v. Myma,* 278 Pa. 505, 123 A. 486, 487 (1924)).

To properly evaluate the questioning conducted by the trial court, we must consider it in context. The Commonwealth argues that the trial court's questions were aimed to highlight that Mr. Powell's assertions about Ms. Beverly's absence at the scene of the murder was not based on first-hand knowledge. Mr. Powell was asked whether he was on drugs at the time of the murder and he responded that Ms. Beverly was on drugs as well. N.T. 7/12/1995 (p.m.) at 9–10. On cross-examination, the prosecutor attempted several times to question Mr. Powell about his motives for interjecting his opinion on Ms. Beverly's sobriety, but Mr. Powell once answered "[b]ecause she was high" and then responded "[t]hat was in my mind." *Id.* at 12. Given this context, respecting the first set of questioning appellant cites, the trial court did not abuse its discretion in seeking a more pointed explanation for Mr. Powell.

As to the trial court's questioning of Mr. Powell concerning his recollection that Ms. Beverly was not at the murder scene, the court's intervention was again justified in

context. The prosecutor had repeatedly asked how Mr. Powell knew Ms. Beverly was not at the murder scene, resulting in an argumentative cross-examination. *Id.* at 16–17. The trial court's intervention ended this line of unproductive questioning, but also made it clear to the jury that the police did not simply arrest everyone at the scene. Moreover, appellant's accusations that the trial court wanted to help the prosecution are belied by the court's admonishments of the prosecutor. Just a few lines before the latter questioning that appellant cites, the trial court twice instructed the prosecutor to stop interrupting Mr. Powell with questions before he had finished speaking. *Id.* at 16 & 17. This record squarely belies appellant's hindsight claim of partiality.

Appellant additionally accuses the trial judge of directly questioning Mr. Powell's credibility:

THE COURT: This in no way indicates anything on my part as to your credibility. I'm just a judge. I'm in no way expressing an opinion. Did you take anything this morning that makes you a little light-headed?

MR. POWELL: No. That's just me.

THE COURT: That's the way you always are. I'm not being derogatory; I wanted to know so I know whether we should go on or have a recess or what.

*Id.* at 20. Appellant speculates the trial court's above disclaimer and question was calculated to diminish Mr. Powell's testimony, which was harmful because he was the only defense witness offered to discredit the lone eyewitness to the murder, Ms. Beverly.

The Commonwealth disputes appellant's claim. When the trial court asked if Mr. Powell had taken anything that would make him light-headed, the Commonwealth asserts the court's question was a logical response to Mr. Powell's odd demeanor and responses on the witness stand. The Commonwealth also notes that the court prefaced his question to Mr. Powell by stating that he was not commenting on Mr. Powell's credibility.

Even laying aside the fact that the cold record does not reveal demeanor, the record shows that Mr. Powell's testimony had been peculiar. Mr. Powell asserted that Ms. Beverly had been "totally lost in space" at the scene of the murder and, just prior to the question at issue, his answer was odd and rambling. For instance, Mr. Powell's prior uninterrupted answer included the following statements: "giving me feedback, feedback, crazy questions. That does not make no sense to me, that you asking me to answer crazy questions;" "Think about it. Duh. Think about it;" "Let me know who would go back, please. Please somebody let me know. Would anybody here go back, please raise your hand, please let me know;" and "Does it sound logical? Am I right or am I wrong? Does it sound logical?" *Id.* at 19–20. Considering Mr. Powell's lengthy and strange response and the fact that counsel, who was present and could observe the demeanor and assess whether the trial court was acting out of "partiality," this hindsight claim fails. We see no evidence of judicial impropriety.

### 2. Prior Relationship with the Prosecutor

Appellant next alleges that the trial judge must have acted in a biased manner, favoring the prosecutor, because the prosecutor had testified on behalf of Judge Ribner in an unrelated legal matter. Appellant states that Judge Ribner revealed during the proceedings in *Commonwealth v. Christopher Williams,* Crim. Div., April Term, Nos. 1770–96 & 1825–46 (Pa. C.C.P., Philadelphia County 1992) that the prosecutor had testified on his behalf in another legal matter. Appellant does not identify the case in which the prosecutor supposedly testified on the trial judge's behalf, or how it reveals bias at this trial.

The Commonwealth notes that this attack on the trial judge is frivolous since appellant failed to provide any affidavits or documentary evidence to support his claim. Appellant's omission, the Commonwealth maintains, dictates that his claim should be dismissed.

Appellant did not attach any document or any evidence to his PCRA petition to substantiate his insinuation. Likewise, in his reply brief before this Court, appellant did not address the Commonwealth's argument that his claim was frivolous or provide other evidence to support his claim. Pennsylvania Rule of Criminal Procedure 902(D) requires that a PCRA petitioner "attach to the petition any affidavits, records, documents, or other evidence which show the facts stated in support of the grounds for relief, or the petition shall state why they are not attached." Appellant, however, did not attach a record of the supposed proceeding where the prosecutor testified on behalf of the trial judge, a signed declaration of a witness willing to testify to the proceeding, or any other document that would support his attack on the trial judge. This claim is both frivolous and reckless.

## D. Miscellaneous Failures of Trial Counsel During Guilt Phase[13]

### 1. Impeachment of Commonwealth Witnesses

Appellant broadly argues that trial counsel did not properly impeach Edgar Clarke, Ramon Burton, and Ruth Beverly, making direct appeal counsel ineffective for not raising trial counsel's missed impeachment opportunities. The Commonwealth, of course, denies that any of appellant's impeachment claims have merit.

In respect to each of these witnesses, the PCRA court, without specifically addressing any particular argument appellant advanced, found that appellant's complaints merely implicated the "depth and angle" of impeachment areas already explored by defense counsel at trial. PCRA ct. slip op. at 12. Due to the' nature of the proposed failures, the PCRA court held that appellant could not demonstrate prejudice such that there was a reasonable probability that the verdict would have been different without the alleged errors.

The PCRA court was correct, as consideration of appellant's specific claims in respect to each witness demonstrates.

**13.** Appellant's claim V.

### a. Edgar Clarke

Appellant claims that counsel was ineffective in his impeachment of Mr. Clarke, in that counsel did not (1) elicit that Mr. Clarke was never charged for selling drugs on the day that William Lloyd was murdered and (2) establish that Mr. Clarke failed to appear for an August 1994 court date for a theft charged under another name.

The Commonwealth characterizes appellant's claims as baseless and frivolous. The Commonwealth points out that appellant never offered any proof by way of supporting documentary evidence that Mr. Clarke evaded drug charges in exchange for his testimony against appellant. As to the theft charge, the Commonwealth notes that Mr. Clarke did testify about the charge. Moreover, the only proof appellant cites as to particular aspects of Mr. Clarke's theft case comes from a hearing dated after appellant's trial and in an unrelated case.

As we noted earlier, Criminal Rule 902(D) requires a PCRA petitioner to attach supporting documentary evidence for his claims or an explanation as to why such evidence was unavailable. When evidence is easily obtainable and would provide necessary support for a petitioner's claim, we have rejected claims that were unsupported by documentary evidence. *See Commonwealth v. Begley,* 566 Pa. 239, 780 A.2d 605, 630–31 (2001) (rejecting claim due to absence of affidavit stating witness would have been available to testify at trial); *Commonwealth v. Collins,* 546 Pa. 616, 687 A.2d 1112, 1115 (1996) (claim fails in absence of document showing petitioner requested appeal).

Here, appellant never offered to prove that the Commonwealth bargained with Mr. Clarke in exchange for his testimony. Moreover, Mr. Clarke expressly denied at appellant's trial that he was promised any benefit from the Commonwealth in exchange for his testimony. N.T. 7/7/1995 at 76. On this record, appellant has failed to prove that defense counsel had a basis in fact to impeach Mr. Clarke's testimony in relation to the alleged lack of drug charges. Nor does appellant prove prejudice.

Regarding the circumstances of Mr. Clarke's theft charge, appellant has not begun to establish that he was prejudiced by trial counsel's alleged failure to extract further details. At appellant's trial, Mr. Clarke admitted that he had an open theft charge pending against him. *Id.* We are unconvinced that Mr. Clarke's credibility would have been undermined to a materially greater degree if only trial counsel had also proven Mr. Clarke failed to attend a hearing in the case or that he had an alias. Neither of appellant's impeachment claims involving Mr. Clarke succeeds.

### b. Ramon Burton

Appellant next argues that trial counsel was ineffective for failing to impeach Mr. Burton, listing virtually the same evidence appellant claimed earlier in his Brief the Commonwealth was guilty of withholding from defense counsel. *See supra* at Section B(4)(c). Specifically, appellant argues that trial counsel should have impeached Mr. Burton with evidence that: (1) he was carrying an unregistered handgun on the night of the murder, yet faced no criminal charges for the act; (2) he operated a narcotics business out of his store and escaped prosecution in relation to that illegal business; (3) he failed to file IRS business records; (4) he entered the country illegally as a "Minister of Religion;" and (5) he used aliases.

The Commonwealth revives its arguments from appellant's *Brady* claim. It notes that the jury would not be surprised that Mr. Burton had an unregistered weapon or did not file business records with the IRS. Additionally, the Commonwealth argues appellant never offered to prove that Mr. Burton's gun was unregistered or that Mr. Burton had not filed IRS records. As for the INS file, the Commonwealth again contends that it would not have been available to trial counsel since it did not exist at the time of appellant's trial. Finally, the Commonwealth notes that appellant never demonstrates how any of this information, if presented at trial, would have altered his verdict.

We agree that appellant has not shown that he was preju-
diced by trial counsel's alleged impeachment lapses. Estab-
lishing that Mr. Burton was involved in other illegal activities
would not ineluctably alter the jury's opinion of him, much less
lead to a different verdict. The INS record appellant cites did
not exist at the time of trial; any accusation against counsel
on that basis is frivolous. To the extent that appellant implies
that Mr. Burton provided testimony in exchange for a promise
of favorable treatment from the Commonwealth, appellant's
allegations are unsupported by proof. These claims are base-
less.

### c. Ruth Beverly

Appellant next claims that trial counsel should have
impeached Ms. Beverly on the basis of false statements she
gave to the police on the night of the murder. Since Ms.
Beverly gave false statements to the police, appellant argues,
she had a motive to lie at appellant's trial to avoid prosecution
for her crime, contrary to the prosecutor's contentions at trial.
Appellant also argues that his trial counsel should have elicit-
ed testimony from Ms. Beverly concerning the "coercive pres-
sure" the police applied to produce her eventual statement
against him. Appellant's Brief at 36.

The Commonwealth argues that the record does not reflect
that the police applied undue pressure on Ms. Beverly to force
her to give a statement. Moreover, the Commonwealth notes,
Ms. Beverly's displeasure with the police enhances her credi-
bility because she cooperated with them despite that displea-
sure. As for appellant's charge that Ms. Beverly gave a false
statement to police on the night of the murder, the Common-
wealth notes that this is another of appellant's unsupported
accusations. However, even if Ms. Beverly did give such a
false statement, the Commonwealth asserts, such would be
understandable given her frightened state. The Common-
wealth notes that Ms. Beverly moved out of Philadelphia
because she was threatened by appellant's friends to stay
silent, which thoroughly undercuts appellant's speculation that
she testified against him to escape criminal sanction.

Appellant's trial counsel attempted to impeach Ms. Beverly on several counts, most notably, accusing her of having sexual relations with appellant for drugs and uncovering Ms. Beverly's former drug addiction. *E.g.*, N.T. 7/11/1995 at 141–43; 160–61. Despite Ms. Beverly's admitted drug use, appellant was convicted of murdering William Lloyd. The additional impeachment evidence that appellant now argues should have been used at trial would not have changed that outcome.

Indeed, the alleged impeachment evidence may well have bolstered Ms. Beverly's credibility. Ms. Beverly testified that she feared for her life after witnessing the crime and, after receiving threats not to talk to police, she decided to move her family away from Philadelphia. N.T. 7/10/1995 at 148, 180. Her fear would explain appellant's accusation, if only it were true, that Ms. Beverly lied to the police on the night of the murder about her identity. There is no evidence, however, that Ms. Beverly was threatened with or feared being prosecuted for making false statements to the police. Furthermore, had defense counsel established that Ms. Beverly gave a false statement to the police at the scene of the murder, this testimony would have undermined defense witness, Mr. Powell, who asserted that Ms. Beverly was not in the location where the murder occurred.

Addressing appellant's accusation that the police coercively obtained a statement from Ms. Beverly, the record of the hearing that appellant cites to support his argument does not reflect that she was so compelled by the police. N.T. 2/22/1994 at 52–53. Instead, it illustrates that Ms. Beverly was angry with the police for bringing her to the police station when she had not eaten or bathed, but she nevertheless told the police what she observed. Once again, even if appellant's fictitious allegations were accepted as true, he has not proven that there is reasonable probability that the verdict would have been different had counsel presented these accusations to the jury.

### 2. Use of Commonwealth Discovery

Appellant next claims that trial counsel was ineffective for failing to call Penny Hairston to testify that he did not

see appellant on the night of the murder and, instead, saw Ike Jones with a .22 caliber gun, a gun capable of firing the bullets that killed William Lloyd.[14] Appellant argues that Mr. Hairston's testimony would have supported his claim that he did not commit the murder, especially since Mr. Hairston did not tell the police that he saw appellant on the street once the shooting began. To support this claim, appellant cites separate statements that Mr. Hairston gave the police. Appellant asserts that Mr. Hairston was available to testify, but was never called.

The Commonwealth responds that the testimony from Mr. Hairston would merely have been cumulative evidence of the gun battle that occurred outside of Mr. Hairston's home and which involved several individuals. Testimony from Mr. Hairston, the Commonwealth states, would not have been exculpatory given the number of people involved in the shootout and given that an eyewitness saw appellant murder William Lloyd.

The PCRA court found that Mr. Hairston could not have provided significant impeachment evidence relevant to appellant's guilt. As such, the court ruled that appellant did not show a reasonable probability that if the evidence had been presented, the verdict would have been different.

Mr. Hairston's testimony would have only validated the testimony of Mr. Clarke and would not have been exculpatory. The jury heard testimony that several men were involved in the initial gun battle prior to the murder. Also, proof that Mr. Jones had been carrying a .22 caliber handgun does not prove that appellant did not have a similar gun. Therefore, appellant's claim is without merit.

### 3. Oral Statement by Monique Wylie

Appellant next assails his trial counsel for failing to object to Officer Glenn Keenan's testimony concerning what Monique Wylie told him about the robbery at Mr. Hairston's on the

14. Ike Jones, a.k.a. Anthony Johnson, and another man entered Penny Hairston's house to steal drugs shortly before William Lloyd was murdered. Mr. Clarke was in Mr. Hairston's home at the time of the intrusion.

night of the murder and for failing to object to the prosecutor's use of Officer Keenan's statement during his summation. Specifically, appellant notes that Ms. Wylie testified to being asked by Mr. Jones on the night of the murder to help him rob Mr. Hairston's home, but did not name any other individuals who would be involved. Appellant objects to Officer Keenan's contrary testimony that Ms. Wylie told him that appellant was going to be involved in the robbery with Mr. Jones. Appellant contends that Officer Keenan's account of Ms. Wylie's oral statement to police was inadmissible for its substantive purpose. Officer Keenan's testimony was highly prejudicial, appellant argues, because the prosecutor utilized it in his closing. Moreover, appellant claims that trial counsel was ineffective for failing to introduce the portion of Ms. Wylie's official police statement that contradicted Officer Keenan's recollection.

The Commonwealth disputes that Ms. Wylie's oral statement to Officer Keenan was offered as substantive evidence and, instead, argues that the statement was introduced to impeach Ms. Wylie's testimony. During direct examination, the Commonwealth notes that Ms. Wylie denied that Mr. Jones had told her that appellant and a third man would also rob Mr. Hairston's home. According to the Commonwealth, Ms. Wylie's testimony was contrary to what she had told the prosecutor before testifying, namely, that Mr. Jones told her appellant would participate in the robbery. The Commonwealth further notes that the prosecutor's purpose for introducing the statement is supported by his closing, where he remarked that Ms. Wylie had not been completely truthful on the witness stand. Furthermore, the Commonwealth argues that appellant cannot show prejudice by the admission of the statement, because there was substantial other evidence to tie him to the robbery.

Appellant also makes an additional layered ineffectiveness argument related to Ms. Wylie's statement, claiming that the jury should not have found the sentencing aggravator under 42 Pa.C.S. § 9711(d)(6) (murder committed in the perpetration

of a felony) because it was based on the improper admission of Ms. Wylie's statement to Office Keenan.

The credibility of a witness may be impeached by the party calling that witness. Pa.R.E. 607(a); *see Commonwealth v. Kimbell*, 563 Pa. 256, 759 A.2d 1273, 1276–77 (2000). Any evidence relevant to the impeachment issue may be used against a witness, except that which is prohibited by the rules of evidence. Pa.R.E. 607(b). Hearsay, which is a statement made by someone other than the declarant while testifying at trial and is offered into evidence to prove the truth of the matter asserted, is normally inadmissible at trial. Pa.R.E. 801(c) & 802. Impeaching a witness through the introduction of an inconsistent out-of-court statement will not be considered hearsay if the statement is: (1) under oath subject to the penalty of perjury at a trial, hearing, other proceeding, or deposition; (2) in writing and adopted by the declarant; and (3) a verbatim contemporaneous recording of the oral statement. Pa.R.E. 803.1(1).[15]

We agree with appellant that there was a basis to object to Officer Keenan's recollection of Ms. Wylie's statement, as it was an oral recollection of what Ms. Wylie told him and did not comport with the requirements of Rule 803.1(1). However, appellant has not shown prejudice because there was ample independent evidence that appellant was a co-conspirator in the robbery that occurred before William Lloyd's murder. Mr. Burton testified that appellant was shooting at his car shortly after Mr. Hairston's house had been robbed. Mr. Clarke recalled appellant being present at Mr. Hairston's house earlier in the day with the two men who robbed him at that location a short time later. Additionally, Ms. Wylie testified that appellant was with Mr. Jones at a local bar when Mr. Jones asked her to participate in the robbery on the day of the murder. This evidence alone would have been sufficient to convict appellant of conspiracy to commit robbery and, therefore, has not proven *Strickland* prejudice.

---

**15.** Prior statements by witnesses may also be admitted in accordance with Pa.R.E. 613.

#### 4. Failure to Object to Reasonable Doubt Instruction

Appellant next accuses trial counsel of ineffectiveness for failing to object to the reasonable doubt instruction given at both the guilt and penalty phases. Specifically, appellant says that the trial court improperly instructed the jury that a reasonable doubt is a "a doubt that would restrain a reasonably careful and sensible person from acting upon [a] matter of importance in his or her own affairs." N.T. 7/13/1995 at 6. Instead of using the word "restrain," appellant argues that the trial court was required to use the word "hesitate," which is employed in the non-binding Pennsylvania Standard Criminal Jury Instruction § 7.01(3).

The Commonwealth argues that trial counsel did not err when he failed to object to the use of the word "restrain" in the reasonable doubt instruction, since this Court has repeatedly approved the use of the word in such instructions. The PCRA court agreed.

When evaluating jury instructions, this Court must consider whether the instructions as a whole were prejudicial. *Commonwealth v. Hawkins,* 567 Pa. 310, 787 A.2d 292, 301 (2001). A trial court is not required to use any particular jury instructions, or particular forms of expression, so long as those instructions clearly and accurately characterize relevant law. *Id.* (citing *Commonwealth v. Prosdocimo,* 525 Pa. 147, 578 A.2d 1273, 1274 (1990)). We have previously approved of jury instructions that describe a reasonable doubt as something that would "restrain a reasonably careful and sensible person from acting." *Commonwealth v. Ragan,* 560 Pa. 106, 743 A.2d 390, 401 (1999); *see also Commonwealth v. Young,* 456 Pa. 102, 317 A.2d 258, 263 (1974); *Commonwealth v. Donough,* 377 Pa. 46, 103 A.2d 694, 697 (1954). In *Commonwealth v. Porter,* we held that "the distinction between 'hesitate before acting' and 'restrain before acting' is *de minimis* and clearly such a subtle variation in phrasing would not be an abuse of the trial court's discretion." 556 Pa. 301, 728 A.2d 890, 900 (1999). In light of this existing authority, the notion that counsel was ineffective is frivolous.

### 5. Handgun Associated with Appellant's Arrest

██ Appellant's final claim under this category is that trial counsel and appellant counsel were ineffective for not challenging the testimony of the ballistics expert concerning the .38 caliber handgun found with appellant at the time of his arrest, which the expert noted could have fired some of the bullets found in Mr. Burton's car. Appellant argues that the probative value of this testimony was outweighed by its prejudicial effect, because: (1) the gun is akin to bad acts evidence; (2) the gun was not the same caliber as the .22 caliber bullets that killed the victim; (3) there was a distinct time interval between the bullets that were fired at Mr. Burton's car and at the victim; and (4) bullets that could be attributed to a .38 caliber handgun were found where Mr. Burton was fired at and not at the murder scene. Moreover, appellant notes that the jury had no basis to judge the importance of the testimony from the ballistics expert and should have been told how may other guns were capable of firing the bullets that killed the victim.

The Commonwealth devotes little argument in response, claiming in a single paragraph that appellant's argument is baseless because the .38 caliber gun found at the time of appellant's arrest could have been the source of several bullet fragments found in Mr. Burton's car. Agreeing with the Commonwealth, the PCRA court found that the factual circumstances surrounding the gun made testimony concerning it admissible.

██ The ballistics expert testified that the gun recovered from appellant on the day he was arrested could have fired a bullet fragment found in Mr. Burton's car. N.T. 7/11/1995 at 74. On cross-examination, however, appellant's trial counsel clarified that the bullet fragments found near William Lloyd's body did not match any of the weapons recovered by the police in their investigation. *Id.* The recovered gun certainly was relevant to establish a possible link between appellant and the vicinity of the murder scene and, as such, was admissible. Appellant's argument goes to the weight of the evidence.

Moreover, appellant has not proved prejudice resulting from its admission, particularly because trial counsel, far from being incompetent, established that the gun recovered on appellant at the time of his arrest did not match the murder weapon.

### E. Jurors Saw Appellant in Handcuffs[16]

 Appellant next claims that his trial and appellate counsel were ineffective for neglecting to take sufficient steps to establish that he had been prejudiced at trial when several jurors saw him outside of the courtroom in handcuffs, largely resurrecting a claim he argued on direct appeal. Appellant cites signed declarations obtained from juror Duwan Lang and alternative juror Cynthia Wright as evidence that jurors did see him in handcuffs during the trial, noting at least one of the jurors thought appellant looked dangerous. Appellant argues that the trial court's instructions did not cure any resulting prejudice and, instead, actually suggested that appellant was a dangerous individual with past convictions. Moreover, he accuses trial counsel of being ineffective for not requesting that the trial court poll the jury, conduct a hearing, or issue a proper instruction in connection with the purported incident. Appellant labels his appellate counsel as ineffective for failing to litigate these issues on direct appeal in the manner that current counsel prefers to pose the issue.

The Commonwealth argues that appellant's claim was previously litigated, just as the PCRA court decided below, because direct appeal counsel argued that the trial court abused its discretion in denying appellant's motion for a mistrial on the basis that some jurors may have seen him in handcuffs. However, since appellant's claim was not previously litigated as an ineffective assistance of counsel claim, we will not dismiss it out of hand. *See Collins,* 888 A.2d at 573.

In *Commonwealth v. Evans,* this Court found that the possibility that jurors saw the defendant in handcuffs would not necessarily "contaminate the jury's decision-making process." 465 Pa. 12, 348 A.2d 92, 94 (1975). Over a decade

16. Appellant's claim VI.

later, this Court declared that a brief viewing of the defendant in handcuffs "is not so inherently prejudicial as to strip the defendant of the presumption of innocence." *Commonwealth v. Lark*, 518 Pa. 290, 543 A.2d 491, 501 (1988).[17]

Appellant makes no effort to explain how his trial and appellate counsel can be deemed to have acted unreasonably in light of this Court's prior holdings that a jury's brief viewing of a defendant in handcuffs is not so prejudicial as to destroy a jury's objectivity in rendering a verdict. Even though this Court's case law clearly indicated that appellant could not expect more than a cautionary instruction from the trial court in the event jurors observed him in handcuffs, in point of fact trial counsel here requested, but was denied, relief in the form of a mistrial. Trial counsel was not incompetent in failing to ask the trial court to poll the jury or conduct a hearing.

Similarly, the trial court's instruction in response to appellant's request for a mistrial did not harm appellant. The trial court instructed the jury that:

The fact that someone is arrested and accused of a crime or even the fact the he might be held in custody, that is not any evidence against him and you should not draw any conclusion from those facts.

Sometimes a person is held in custody for reasons which have nothing to do with guilt or innocence.

You cannot in anyway consider that as evidence one way or the other.

N.T. 7/13/1995 at 4. Prudently, the trial court did not alert the jury's attention to the specific reason why appellant requested a mistrial and instructed the jury that it could not consider the possibility that appellant might be held in custody as evidence of his guilt or innocence. Appellant's contention that the trial

17. The main cases appellant cites in support of his argument, *Rhoden v. Rowland*, 172 F.3d 633, 637 (9th Cir.1999) (whether keeping leg shackles on defendant at trial was prejudicial), and *Holbrook v. Flynn*, 475 U.S. 560, 568–69, 106 S.Ct. 1340, 1345–46, 89 L.Ed.2d 525 (1986) (whether security officers may be present at the defendant's table during trial), do not remotely resemble the factual circumstances underlying appellant's claim.

court's instruction necessarily suggested that he committed past crimes is not supported by the record. Moreover, even if one could construe the trial court's instruction as appellant does, the trial court instructed the jury that they could not consider appellant's possible custodial detention as evidence. There would have been no merit in an objection to the instruction from appellant's prior counsel.

## F. Admission of Evidence from Officer Joseph Thomas[18]

██ Appellant claims that it was improper for the trial court to admit hearsay testimony from Officer Joseph Thomas and, accordingly, his prior counsel were ineffective for not objecting to the testimony. Particularly, appellant contends that Officer Thomas should not have been allowed to testify that an announcement on police radio, on the night of the murder, informed him that William Lloyd's shooter had run toward the 2100 block of Catherine Street. Appellant asserts that this testimony violated his Confrontation Clause rights and that he was prejudiced by admission of the information, as the prosecutor argued in his closing that the police were informed that William Lloyd's murderer ran in the direction of where appellant lived on Catherine Street.

The Commonwealth argues that Officer Thomas's testimony was properly admitted as course of conduct evidence, permitted for the purpose of establishing that the police followed a specific course based on information transmitted to the police. The Commonwealth argues that the police found and arrested appellant based, in part, on the information disseminated on the radio. Additionally, the Commonwealth notes that appellant cannot show that the verdict would have been different if the statement had been excluded. For its part, the PCRA court accepted the Commonwealth's instant argument and denied appellant's claim.

██ The Confrontation Clause affords the accused in criminal prosecutions the right to confront adverse witnesses. U.S. CONST. amend. VI. Made applicable to the states via the

18. Appellant's claim VII.

Fourteenth Amendment of the U.S. Constitution, *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965), the Confrontation Clause may be violated by the admission of harmful hearsay testimony as substantive evidence against the defendant. *Collins,* 888 A.2d at 576. However, it is elemental that, "[a]n out of court statement which is not offered for its truth, but to explain the witness' course of conduct is not hearsay." *Commonwealth v. Sneed,* 514 Pa. 597, 526 A.2d 749 (1987) (citing *Commonwealth v. Cruz,* 489 Pa. 559, 414 A.2d 1032, 1035 (1980)); *see also Chmiel,* 889 A.2d at 532. Moreover, of course, the purpose for which evidence is offered determines its admissibility. *See Commonwealth v. DeJesus,* 584 Pa. 29, 880 A.2d 608, 615 (2005).

In the instant matter, Officer Thomas testified that he heard on the police radio that the individual who shot William Lloyd ran toward Catherine Street. He then requested that another officer arriving on the scene check the area. Since the evidence was introduced for course of conduct, and not for its truth, it was not hearsay, and counsel cannot be deemed incompetent for failing to object.

### G. Consolidation of Robbery and Murder Cases[19]

Appellant argues both in consolidating the robbery and murder charges into a single case, and in presenting two different theories of the case during the proceedings against him, the Commonwealth's actions were improper and that his prior counsel were ineffective when they did not argue judicial estoppel prevented the Commonwealth from making inconsistent arguments. Appellant cites the Commonwealth as arguing in its motion for consolidation that appellant and a co-defendant shot William Lloyd during a gun battle with Mr. Burton. Then, at trial, appellant argues, the Commonwealth characterized William Lloyd's murder as a separate shooting appellant singularly committed. Appellant contends that his trial counsel was ineffective for failing to publish to the jury the Commonwealth's admission that two people struck the victim in the shootout, because such evidence would have

19. Appellant's claim VIII.

provided the jury with reasonable doubt, and direct appeal counsel should have argued this claim.

The Commonwealth responds that consolidation of the murder and robbery cases was proper, as the Commonwealth proved that appellant and his co-conspirators robbed a house, engaged in a gun battle outside of the house, and, as defendant fled, he committed murder. The Commonwealth says appellant falsely alleges that the Commonwealth claimed at trial that the shooting stemmed from two separate incidents.

The PCRA court held that there was no error in the trial court's consolidation of the cases because there was ample evidence to show that the charges were related.

■■■ Offenses charged in separate indictments may be joined together if the "offenses charged are based on the same act or transaction." Pa.R.Crim.P. 582(A)(1)(b). The trial court has discretion to decide whether separately charged offenses should be joined together at trial, and its decision will only be overturned where the trial court abused its discretion or the consolidation clearly prejudiced the defendant. *Commonwealth v. Robinson*, 581 Pa. 154, 864 A.2d 460, 481 (2004), *cert. denied*, —— U.S. ——, 126 S.Ct. 559, 163 L.Ed.2d 470 (2005) (citing *Commonwealth v. Newman*, 528 Pa. 393, 598 A.2d 275, 277 (1991)).

Here, the Commonwealth consistently maintained in the motion for consolidation, oral argument for the motion for consolidation, and trial that appellant was solely responsible for killing William Lloyd, the innocent bystander in a gunfight that began shortly after the robbery at Mr. Hairston's house. Appellant's argument that the Commonwealth presented two theories of the case is refuted by the very documents that he attached to his Supplemental PCRA petition. Although the prosecutor said during his oral argument on the motion that "[t]hey strike a bystander," in his next breath he asserted that an eyewitness saw appellant shoot the decedent. N.T. 3/20/1995 at 24. Appellant blatantly quoted the prosecutor's statement out of context, in an attempt to characterize a poor choice of words as the Commonwealth's intentioned admission.

Appellant's prior counsel was not ineffective, but was instead ethical, for failing to forward a similarly frivolous argument.

## H. Jury Instruction Regarding a Permissible Inference[20]

Appellant claims that the trial court gave an improper permissible inference instruction related to the doctrine of transferred intent when it allowed the jury to infer appellant's specific intent to kill William Lloyd from the use of a deadly weapon on a vital organ; thereby, allegedly relieving the Commonwealth from its burden of proof to establish intent. The wounds on the victim's body, appellant maintains, are irrelevant to the determination of whether appellant had the specific intent to kill someone else. Appellant argues that it is only rational to infer a specific intent to kill when the victim is the person that the defendant intended to shoot. Lastly, appellant contends his trial counsel was ineffective when he did not object to the instruction and, thereafter, appellate counsel was ineffective for not raising trial counsel's ineffectiveness on direct appeal.

The Commonwealth asserts that appellant's claim was previously litigated, since he challenged the appropriateness of the transferred intent charge, albeit on alternate theories of relief, on direct appeal. The PCRA court accepted this argument below, but we will review appellant's claim within the context of the layered ineffective assistance claim he presents to us, a claim which he did not raise on direct appeal. *See Collins*, 888 A.2d at 573.

A permissive inference is an evidentiary tool that permits a fact-finder to proceed on inferential reasoning, such that a fact-finder may infer an elemental fact from proof of a basic fact. *Commonwealth v. MacPherson*, 561 Pa. 571, 752 A.2d 384, 389 (2000). When a permissive inference leaves the fact-finder free to accept or reject the inference, a permissive inference does not affect the burden of proof and it only affects the beyond a reasonable doubt standard when, under the facts of the case, there is no way the fact-finder could arrive at the conclusion permitted by the inference. *County*

**20.** Appellant's claim IX.

*Court of Ulster County, N.Y. v. Allen,* 442 U.S. 140, 157, 99 S.Ct. 2213, 2225, 60 L.Ed.2d 777 (1979); *see also Commonwealth v. Hall,* 574 Pa. 233, 830 A.2d 537, 547–48 (2003). We have opined that a "[s]pecific intent to kill can be inferred from the use of a deadly weapon upon a vital part of the victim's body." *Commonwealth v. Damon Jones,* 530 Pa. 591, 610 A.2d 931, 938 (1992).

Here, the trial court instructed the jury that, if it found that appellant used a deadly weapon on a vital part of the victim's body, it was free, but not required, to infer that appellant had a specific intent to kill. The evidence presented at trial permitted this inference because the Commonwealth presented testimony that appellant shot at Mr. Burton shortly before William Lloyd was killed. Consequently, the trial court did not erroneously shift the burden of proof for specific intent away from the Commonwealth. Furthermore, it bears noting that appellant's theory is novel (and indeed unsupported by existing authority). Counsel cannot be faulted for failing to advance novel (and as yet unaccepted) theories.

## II. PCRA DISCOVERY[21]

Appellant renews his request for discovery, which was denied by the PCRA Court. He makes a broad request that the Commonwealth be ordered to replicate all discovery provided to trial counsel, because PCRA counsel claims uncertainty whether they received all discovery materials from trial counsel and current counsel received nothing from direct appeal counsel. More specifically, hoping to dispute that the gun recovered from appellant at his arrest could be linked to the instant crime, appellant desires all ballistics reports and evidence for ballistics testing. Appellant also asks for school records from Glen Mills, where appellant was placed in detention as a juvenile, and his corresponding juvenile files, since he says they show that he performs well in detention. Appellant next requests Officer Keenan's disciplinary file and any other evidence showing a history of payments to witnesses. Finally, appellant seeks any information in the Commonwealth's files

21. Appellant's claim X.

related to Ramon Burton, including information on his 1991 criminal prosecution under another name, because, he says, Mr. Burton's credibility was important to the case against him.

The Commonwealth contends that appellant's claim is unreviewable, as he did not sufficiently develop how the requested discovery relates to his PCRA appeal. The Commonwealth calls appellant's request a "boilerplate laundry list" that is insufficient to establish good cause for the production of the materials he desires.[22]

 "On the first counseled [PCRA] petition in a death penalty case, no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of good cause." Pa.R.Crim.P. 902(E)(2). A denial of a discovery request is reviewed for abuse of discretion. *Commonwealth v. Lark*, 560 Pa. 487, 746 A.2d 585, 591 (2000). In *Commonwealth v. Williams*, 557 Pa. 207, 732 A.2d 1167, 1175 (1999), this Court held that general requests for PCRA discovery are insufficient to establish good cause, especially when it is unclear why PCRA counsel was unable to obtain discovery materials from former counsel. Furthermore, a PCRA petitioner is not entitled to discovery where he has not shown the existence of requested documents, *Commonwealth v. Bridges*, 584 Pa. 589, 886 A.2d 1127, 1131 (2005), as speculation that requested documents will uncover exculpatory evidence does not satisfy the requirements of Rule 902(E)(2). *Commonwealth v. Bryant*, 579 Pa. 119, 855 A.2d 726, 750 (2004).

Appellant's discovery requests are nothing more than a fishing expedition for possible exculpatory evidence. He has not demonstrated that the ballistics results were erroneous, that Officer Keenan was disciplined for paying witnesses, or that the Commonwealth possessed the purported impeachment evidence on Mr. Burton. Moreover, he does not explain why his PCRA counsel may not have received a complete set of trial counsel's discovery files or why the Glenn Mills records he was given at the sentencing hearing, as he admits in a later

---

**22.** The PCRA court did not discuss its reasons for denying appellant's discovery request in its written opinion.

penalty phase claim (III.B.), are now missing. Even if PCRA counsel has been unable to contact direct appeal counsel, appellant has not explained why trial counsel's files would differ. Appellant has not demonstrated good cause to require granting his speculative discovery request pursuant to Rule 902(E)(2).

## III. PENALTY PHASE CLAIMS

### A. Death Qualified Jurors[23]

Declaring that he is entitled to a new sentencing hearing, appellant claims that his sentencing jury was partial because the jury was not life-qualified and that death-qualified jurors were improperly excluded for cause. Appellant argues that his trial counsel was partially responsible for the jury's supposed partiality because he did not conduct any *voir dire* concerning jury bias against imposition of a life sentence or rehabilitate jurors whom the trial court dismissed. Appellant also contends that his trial counsel was ineffective when he accepted jury members without specifically life-qualifying them. Appellant also argues that direct appeal counsel should have litigated these issues, and declares he had no strategic or tactical reason for doing otherwise.

In response, the Commonwealth argues that the trial court properly dismissed jurors for cause who expressed an inability to impose the death penalty or to follow the trial court's instructions on the law. The Commonwealth asserts that there is no legal authority to support appellant's claim that his trial counsel was constitutionally obliged to specifically life-qualify all jury members.

The PCRA court held that the record revealed no instance where the trial court abused its discretion in dismissing a juror for cause, as each of the specific jurors appellant cites expressed doubts about his or her ability to vote for the death penalty. As to appellant's claim that all jurors must be life-qualified, the lower court noted this Court's authority that a selection of a fair and impartial jury does not require such an

23. Appellant's claim II.

inquiry. Moreover, the court found that appellant offered no evidence that the jury ultimately seated in fact was unfair or partial.

■ The decision to disqualify a juror is within the discretion of the trial court, a decision which will only be reversed for an abuse of discretion. *Commonwealth v. Wilson*, 543 Pa. 429, 672 A.2d 293, 299 (1996). Any person may be excluded from a jury who holds views on capital punishment that prevents or substantially impairs that person from adhering to the trial court's instructions on the law. *Robinson*, 864 A.2d at 488; *Commonwealth v. Lark*, 548 Pa. 441, 698 A.2d 43, 48 (1997). "A juror's bias need not be proven with unmistakable clarity." *Commonwealth v. Morales*, 549 Pa. 400, 701 A.2d 516, 525 (1997). For instance, in *Morales*, we held that a juror expressed sufficient doubt about his ability to impose the death penalty when he said, "I'm not certain that I could judge someone fair enough to give them the death penalty." *Id.* We also found no error in excluding a juror who did not "feel comfortable having to make a decision about someone else's life" and who "always" doubts whether imposing the death penalty is correct. *Commonwealth v. Fisher*, 545 Pa. 233, 681 A.2d 130, 137 (1996).

■■ If a defendant wishes to life qualify jurors on *voir dire*, he must be permitted to do so. *Morgan v. Illinois*, 504 U.S. 719, 735, 112 S.Ct. 2222, 2233, 119 L.Ed.2d 492 (1992); *Commonwealth v. D'Amato*, 579 Pa. 490, 856 A.2d 806, 813 (2004). However, there is no requirement that trial counsel life-qualify jury members and counsel cannot be rendered ineffective for failing to do so. *Robinson*, 864 A.2d at 487–88; *Commonwealth v. Uderra*, 580 Pa. 492, 862 A.2d 74, 79–80 (2004); *Commonwealth v. Speight*, 578 Pa. 520, 854 A.2d 450, 459 (2004); *Commonwealth v. Bond*, 572 Pa. 588, 819 A.2d 33, 50 (2002).

■ Here, the trial court was within its discretion to exclude jurors who expressed reservations about imposing the death penalty and trial counsel had no constitutional obligation

to attempt to change the jurors' views.[24] Furthermore, since existing precedent does not impose a requirement that trial counsel must life-qualify each juror, appellant's claim that counsel was ineffective in this regard is frivolous.

## B. Glen Mills Records[25]

Next, appellant argues that the trial court committed constitutional error, violating both the Eighth and Fourteenth Amendments, as well as Article I, Section 13 of the Pennsylvania Constitution, when it refused to admit appellant's Glen Mills records into evidence without authentication. Appellant contends that his performance at Glen Mills, a school for delinquent youth, demonstrates his positive performance in an institutional setting, making the records vital mitigating evidence. Appellant asserts that the trial court's ruling prevented him from presenting a defense to the death penalty. He also declares that the prosecutor committed a *Brady* violation by not disclosing the records to appellant earlier. Appellant then attaches these claims of trial court and prosecutor error to boilerplate allegations of counsel ineffectiveness.

The Commonwealth responds that appellant has previously litigated this claim and, therefore, it does not deserve redundant review. The PCRA court agreed with the Commonwealth, stating it was bound by this Court's previous resolution of the claim on appellant's direct appeal.

24. To support his claim that the trial court improperly struck jurors for cause, appellant cites, without quotation or summation, the questioning of five individuals: Nelson Daniels Gregory, Patricia Wade, Ethel Clemmons, Marcille McEntee, and Daniel Cuten. Gregory indicated that he did not know whether he could impose the death penalty and he had repeated difficulty giving an unequivocal answer to the trial court's questions. N.T. 7/5/1995 at 25–26. Wade said it would be hard to convince her to vote for the death penalty, particularly because she felt innocent people are sent to jail simply due to poor representation. *Id.* at 48–50. Clemmons affirmed that she would never impose the death penalty regardless of the evidence. *Id.* at 57. McEntee confirmed she had a "problem" with the death penalty. N.T. 7/6/1995 at 10. Cuten twice told the trial court that he would not impose the death penalty and also stated that he was taking medication that would impair his service on a jury. *Id.* at 14.

25. Appellant's claim XI.

On direct appeal, appellant argued that his trial counsel was ineffective for failing to produce witnesses to authenticate the Glen Mills records and introduce the records into evidence. *Carson I*, 741 A.2d at 707. This Court found that appellant did not demonstrate that he was prejudiced by the absence of the records, because he failed to show witnesses were willing and available to testify on his behalf and he neglected to establish that the records would have been helpful to him. *Id.* Thus, any ineffectiveness claim appellant now makes in respect to his trial counsel's failure to present witnesses to authenticate the records is previously litigated. 42 Pa.C.S. § 9544(a)(2). However, to the extent that appellant argues that appellate counsel was ineffective for failing to make certain arguments to the Court on direct review, we accept the claim as a distinct ineffectiveness claim and will conduct a substantive review. *See Collins*, 888 A.2d at 573.

Appellant's argument that appellate counsel should have raised a *Brady* argument on direct appeal is curious, since he previously acknowledged on direct appeal that trial counsel could have become aware of the Glen Mills records simply by questioning his client and gathering appellant's criminal history through discovery. *Carson I*, 741 A.2d at 707. In discussing appellant's *Brady* claims, *supra* at Section I.B.4, we explained that there is no *Brady* violation where the information is available through non-governmental sources and can be obtained through defense counsel's own reasonable investigation. *Morris*, 822 A.2d at 696; *Paddy*, 800 A.2d at 305. Obviously, appellant's attendance and performance at Glen Mills was not information exclusively within the government's knowledge such that it qualifies as *Brady* material. Consequently, this portion of appellant's argument is frivolous.

Regarding appellant's additional argument that the trial court's exclusion of the records violated his constitutional rights and his right to present a defense against the imposition of capital punishment, the United States Supreme Court has stated that a defendant's "disposition to make a well-behaved and peaceful adjustment to life in prison" is a rele-

vant factor in sentencing determinations. *Skipper v. South Carolina*, 476 U.S. 1, 7, 106 S.Ct. 1669, 1672, 90 L.Ed.2d 1 (1986). However, before evidence may be admitted at a sentencing hearing, the trial court must determine whether the evidence is "relevant and admissible on the question of the sentence to be imposed." 42 Pa.C.S. § 9711(a)(2). Business records, which include records from non-profit institutions,[26] are:

> competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission.

42 Pa.C.S. § 6108(b); *see also* Pa.R.E. 803(6) (amended in 2001 to allow business records to be authenticated by certification).

■■■ Here, appellant has never accused the trial court of erroneously ruling that an individual needed to authenticate the Glen Mills records before they could be deemed admissible. Instead, appellant argues that evidentiary rules should not operate to prevent introduction of what he feels is reliable and critical sentencing evidence from being presented to the jury.[27] Counsel was not obliged to invent this novel argument,

**26.** 42 Pa.C.S. § 6108(c).

**27.** Appellant's only cited support for this proposition is *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (per curiam) and *Rupe v. Wood*, 93 F.3d 1434, 1441 (9th Cir.1996). First, this Court is not obligated to follow the decisions of the lower federal courts. *Hall v. Pa. Bd. of Prob. & Parole*, 578 Pa. 245, 851 A.2d 859, 865 (2004). Second, *Green* is readily distinguishable, as it concerned the admission of evidence at a penalty hearing that the petitioner did not participate in the murder. The issue on appeal was the propriety of the exclusion of a statement from the petitioner's separately tried co-defendant, who admitted to another individual that he was solely responsible for murdering the victim that the pair had raped. *Green*, 442 U.S. at 96, 99 S.Ct. at 2151. Even though the statement may have resulted in a lesser sentence for petitioner, it was originally excluded from his sentencing trial because Georgia did not have a hearsay exception for statements against penal interest. *Id.*, 99 S.Ct. at 2151. The Supreme Court

which has yet to be accepted by any controlling tribunal. Appellant is, furthermore, ill-suited to demonstrate prejudice from the exclusion of the Glen Mills records when the jury found four aggravating factors [28] and no mitigating factors.[29] Most notably, appellant's sentencing jury opted not to find any mitigating factors after appellant's presentation of arguably more compelling mitigation evidence than his delinquency school records—namely, testimony from the mother of appellant's child and his cancer-stricken father that depicted appellant as a loving family man. Because appellant has not proved his argument has merit or that he was prejudiced, he is not due any relief on this claim.

## C. Presentation and Investigation of Mitigating Evidence[30]

Appellant next claims that his trial counsel was ineffective for failing to investigate, develop, and present mitigating evidence of his alleged organic brain damage, traumatic childhood, and prior positive adjustments to incarceration. Direct appeal counsel, appellant contends, was subsequently ineffective for failing to argue trial counsel's ineffectiveness. Appellant specifically notes that trial counsel did not present evidence at his sentencing hearing that: (1) he grew up in an unstructured environment in which he was neglected by his parents; (2) his dysfunctional childhood influenced his psycho-

reversed and remanded for a new sentencing trial. *Id.* at 97, 99 S.Ct. at 2152.

**28.** The jury found that appellant committed a killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); in the commission of the offense, appellant knowingly created a grave risk of death to another person in addition to the victim, 42 Pa.C.S. § 9711(d)(7); appellant has a significant history of felony convictions involving the use or threat of violence to the person, 42 Pa.C.S. § 9711(d)(9); and appellant committed the killing while in the perpetration of a drug felony, 42 Pa.C.S. § 9711(d)(13).

**29.** Appellant unsuccessfully presented the following mitigating factors: the defendant has no significant history of prior criminal convictions, 42 Pa.C.S. § 9711(e)(1); the age of the defendant at the time of the crimes, 42 Pa.C.S. § 9711(e)(4); and the catchall mitigator, 42 Pa.C.S. § 9711(e)(8).

**30.** Appellant's claim XII.

logical and emotional development; (3) his organic brain impairments explain his poor impulse control; and (4) he adjusts favorably to a structured environment.

Appellant asserts that trial counsel never researched and uncovered evidence of his difficult childhood, citing trial counsel's failure to interview his mother or brother on any matter and trial counsel's limited questioning of his father and the mother of his child. This lack of investigation, appellant argues, prevented trial counsel from learning that appellant's mother operated a speakeasy and illegal gambling out of her home. Appellant contends that his mother's activities and his father's absence left him with little parental supervision, leaving him primarily in the care of his siblings.

Appellant claims that due to his childhood environment he developed psychological problems. For proof of this assertion, he offers a 2001 signed declaration from Richard Dudley, M.D., stating that his lack of adequate parenting caused him to be immature, developmentally delayed, extremely impulsive, and lacking in self-esteem. Additionally, appellant argues that Dr. Barry Crown, a neuropsychologist, found that he had significant emotional and intellectual impairments, with extremely impaired impulse control, possibly stemming from fetal alcohol syndrome. Appellant argues that trial counsel was ineffective for failing to consult with a mental health expert and develop evidence of his organic brain damage.

Appellant also reiterates that the Glen Mills records were potentially mitigating in that they established his positive response to structured environments, since he performed well academically and was voted "Most Valuable Player" of the school basketball team during his time in juvenile detention. Appellant maintains that trial counsel should have investigated his performance at the juvenile facility in advance of trial and presented the records as mitigation evidence. To support the validity of these claims, appellant provides a signed "declaration" from trial counsel, in which trial counsel summarily admits to failing to adequately prepare for the penalty phase of appellant's trial, claiming that the lapse resulted from his expecting a verdict less than first-degree murder. Appellant

includes no declaration or other proffer respecting appellate counsel.

The Commonwealth contends that appellant's arguments ignore the substantial mitigating evidence that prior counsel actually presented on his behalf and accuses appellant of attempting to retry his sentencing case on a new theory of law. Contrary to appellant's current hindsight mitigation theory, the Commonwealth argues, the evidence appellant presented at the sentencing hearing indicated that he was raised by a caring family. Moreover, the Commonwealth points out that trial counsel had no reason to suspect that appellant had a traumatic upbringing. Even if the jury had heard evidence of appellant's supposedly "unstructured environment," the Commonwealth posits, it is doubtful the jury would have viewed such evidence as mitigating, especially when many people are raised in such environments and do not become murderers.

The Commonwealth further notes that neither of appellant's experts explained how they may be assured that appellant's mental state during their evaluations was the same as it was eight years before, when appellant murdered William Lloyd. Moreover, the Commonwealth deems it significant that appellant's experts did not attempt to explain two contrary mental health examinations of appellant, one three years prior to the murder and one during the penalty phase of appellant's trial. Not only did these more timely mental health exams indicate no signs of brain damage, the Commonwealth argues, but appellant's argument is also directly contrary to his testimony at trial that he had a minimum IQ of 125. In the face of appellant's self-proclaimed high intelligence, the Commonwealth surmises that the jury would have viewed appellant's brain damage claim with disdain. As for appellant's argument pertaining to the Glen Mills records, the Commonwealth argues that that aspect of the claim was previously litigated on direct appeal.

The PCRA court rejected this claim without a hearing. In the PCRA court's view, appellant's mitigation claim was nothing more than "Monday morning quarterbacking" of a thor-

oughly reasonable mitigation presentation by counsel. PCRA ct. slip op. at 18. The court also noted that appellant's sentencing witnesses did not support his current belated claim that he grew up in a home without structure and that trial counsel had no reason to suspect appellant had cognitive defects.

With respect to penalty phase mitigation evidence, counsel has a duty to conduct reasonable investigations or to make reasonable decisions that make certain investigations superfluous. *Commonwealth v. Sneed,* 587 Pa. 318, 899 A.2d 1067, 1079 (2006); *Commonwealth v. Malloy,* 579 Pa. 425, 856 A.2d 767, 784 (2004); *Commonwealth v. Gribble,* 580 Pa. 647, 863 A.2d 455, 475 (2004). Likewise, the U.S. Supreme Court has recognized that counsel for a capital defendant has a duty to "conduct a thorough investigation of the defendant's background." *Williams v. Taylor,* 529 U.S. 362, 396, 120 S.Ct. 1495, 1515, 146 L.Ed.2d 389 (2000). When counsel makes a strategic decision to present a particular penalty phase defense after a thorough investigation of law and facts, his decision is virtually unchallengeable. *Bridges,* 886 A.2d at 1132 (citing *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2052). Strategic decisions made after a less thorough investigation are reasonable to the extent that reasonable professional judgment supports the limited investigation. *Id.* The key to our evaluation of counsel's investigation is not focused on whether counsel should have presented a mitigation case or specific evidence, but rather questions whether the investigation supporting counsel's decision not to present a particular mitigation case or evidence was reasonable. *Malloy,* 856 A.2d at 784. In evaluating the reasonableness of counsel's investigation, this Court must remember that counsel's decisions may depend heavily on the information that his client provides to him. *Gribble,* 863 A.2d at 476.

We have previously affirmed the denial of ineffectiveness claims similar to the one presented by appellant here where a petitioner had an opportunity in a PCRA hearing to demonstrate the merit of his claim, but failed to do so. Thus, in *Bridges,* 886 A.2d at 1132, this Court affirmed the denial of

the petitioner's claim that his trial counsel was ineffective for failing to present mitigation evidence of his traumatic childhood after the PCRA court conducted a hearing on counsel's stewardship. *See also Commonwealth v. Saranchak,* 581 Pa. 490, 866 A.2d 292, 303–04 (2005) (affirming PCRA court's denial of claim that trial counsel was ineffective in presentation of mitigation evidence after PCRA court held evidentiary hearing); *Williams,* 863 A.2d at 520–21 (same). In *Brown,* 872 A.2d at 1150–51, this Court affirmed the denial of the petitioner's claim that trial counsel was ineffective for failing to present mitigation evidence concerning his organic brain damage and traumatic childhood. Although no evidentiary hearing was held in the case, the PCRA court afforded the petitioner several opportunities to demonstrate the possible merit of his claim during hearings that the court held to determine the need for an evidentiary hearing. *Id.* at 1151 n. 9. Conversely, when the PCRA court has held no evidentiary hearing on a claim that trial counsel was ineffective in failing to present this sort of mitigation evidence, but essentially found counsel effective as a matter of law on the mere pleadings, we have remanded the matter for a hearing at least in cases where we deem the question not resolvable, either way, on the pleadings. *Gribble,* 863 A.2d at 476.

Here, the PCRA court did not conduct an evidentiary hearing on the reasonableness of trial counsel's investigation. We, therefore, possess only the trial record to evaluate the substance of appellant's mitigation claims. During appellant's mitigation case, trial counsel presented testimony from his sister, father, paramour, and childhood friend to demonstrate that appellant was an intelligent and generous man. No testimony at the penalty hearing hinted at the traumatic upbringing appellant claims his trial counsel failed to uncover. In 1990, appellant participated in a court-ordered mental health evaluation where he was labeled as having a Mixed Personality Disorder and was described as exhibiting average intelligence, fair social judgment, and some impulsive tendencies. Psychological Evaluation by Jules De Cruz at 2. This evaluation was not presented at appellant's mitigation hearing.

Although appellant had one other mental health evaluation immediately following his conviction in this case, appellant refused to cooperate with the licensed psychologist, Lawrence Bryne, M.Ed. Trial counsel attempted to introduce appellant's Glen Mills records at his sentencing hearing, after being given a copy of them by the prosecutor just before the hearing, but was prevented from doing so without a witness to authenticate them.

Now, appellant offers medical opinions supporting his claim of brain damage, in the form of signed declarations, from Dr. Barry Crown, a licensed psychologist, and Dr. Richard Dudley, licensed in psychiatry, each post-dating the conclusion of appellant's direct appeal. Appellant also offers signed declarations from his mother, father, sister, and brother asserting that trial counsel did not question them about appellant's childhood, which allegedly may have contributed to appellant's purported medical condition. Most notably, appellant's trial counsel signed a declaration essentially admitting he was ineffective.

While the PCRA court summarily dismissed appellant's underlying claim as meritless, we are unable to reach such a judgment where no hearing was held on appellant's factual proffer or the reasonableness of trial counsel's investigation. Although the proffer in this case is not as strong as in some others, and counsel here did put on a case in mitigation which attempted to portray appellant in a positive light, we cannot agree with the PCRA court that the claim respecting trial counsel fails as a matter of law. The deficiencies in appellant's proffer are certainly fair game, both as a matter of credibility and as a matter of assessing the ultimate question. But they are matters that should be assessed only after a hearing where the credibility of appellant's experts, his family members, and his trial counsel can properly be evaluated. Accordingly, we find that the appropriate course is to remand this layered ineffectiveness claim to the PCRA court for an evidentiary hearing. In remanding, we make no predetermination concerning the ultimate strength of the claim; that is for the PCRA court in the first instance. We remind the

parties, as well, that this claim is layered, and that appellant bears the burden of proving appellate counsel ineffective.[31]

## D. Prosecutorial Misconduct During the Penalty Phase[32]

Appellant accuses the prosecutor of engaging in misconduct during numerous junctures during his penalty phase arguments. Then, appellant attaches these claims to a skeletal layered ineffectiveness claim. We will address each of these claims in turn, after a brief review of the focus of our analysis in like claims.

 When arguing to the jury during the sentencing phase of a defendant's trial, a prosecutor must be afforded reasonable latitude and may invoke oratorical flair. *Williams,* 863 A.2d at 522; *Commonwealth v. Stokes,* 576 Pa. 299, 839 A.2d 226, 231–32 (2003). During the sentencing phase, the prosecutor has more latitude to make arguments because the presumption of innocence is no longer applicable. *Commonwealth v. Rompilla,* 554 Pa. 378, 721 A.2d 786, 790 (1998).

### 1. Prosecutor's Reference to His Oath

 Appellant first argues the impropriety of the following statement of the prosecutor:

12 years ago I took an oath to uphold the law and have done that consistently for 12 years. About a week and a half ago you were asked to do the same thing, to uphold the law and every one of you is posed the question, can you and would you in the appropriate circumstance impose the death penalty. And I submit to you, ladies and gentlemen, this is the appropriate circumstance.

N.T. 7/17/1995 at 76. Appellant contends that the jury was more predisposed to believe the prosecutor's words when he referenced the oath he took. Appellant asserts that the prosecutor vouched personally and professionally for the ap-

---

**31.** We make no determination on the Commonwealth's argument that appellant's sub-claim concerning the Glen Mills records is previously litigated, noting that the Commonwealth is free to raise the argument on remand.

**32.** Appellant's claim XIII.

propriateness of the death sentence. Appellant poses that the prosecutor's reference to his experience served to remove from jurors responsibility for his sentence. Finally, appellant maintains that the prosecutor's reference to the jurors' oath implied that the jury was compelled to return the death sentence.

The Commonwealth dismisses appellant's contentions, citing this Court's precedent finding no error in asking the jury to abide by its promise to follow the law. As to the prosecutor's reference to his own oath, the Commonwealth argues the reference was simply placed beside the prosecutor's recollection of the jury's oath. Even if the prosecutor's remark could be construed as vouching for himself, the Commonwealth maintains that appellant cannot show prejudice in light of the four aggravating circumstances the jury found and his failure to establish a single mitigating factor.

The PCRA court ruled that each objection appellant raises respecting the prosecutor's closing argument was fair comment on the record and did not constitute error.

In *Commonwealth v. Rollins,* 558 Pa. 532, 738 A.2d 435, 450 (1999), this Court found no error where the prosecutor asked the jury to "live up to" the promise it made under oath to follow the law. Here, the prosecutor's request of the jury was nearly the same. Although the prosecutor placed that request after recalling the oath he took himself, the prosecutor's reference to both oaths was nothing more than a simple comparison. No doubt, trial counsel could have leveled an objection to the extent the prosecutor personalized his argument. But counsel is not obliged to lodge any and every objection, particularly given that the jury was reminded that the attorneys' arguments were not evidence, but argument. It cannot be said that the reference in this context was so ineluctably prejudicial that the Sixth Amendment required an objection.

### 2. Reference to Fourth Aggravating Circumstance

Appellant next argues that the prosecutor committed misconduct by suggesting that the jury should invoke the

death penalty in this case to protect society. The Commonwealth retorts that the passage appellant quotes is taken out of context. The Commonwealth argues that the prosecutor's remarks were related to the proffered fourth aggravating circumstance that the murder was committed in connection with a drug felony. We agree.

Just before the passage appellant quotes, the prosecutor argued:

The fourth aggravating circumstance in this, ladies and gentlemen, probably makes it the most heinous because it is indicative of everything and it characterizes this entire case, that this whole thing took place because this guy wanted a place to deal his drugs.

N.T. 7/17/1995 at 83. Appellant, however, only singled out the underlined section of the prosecutor's subsequent argument:

*And I want you to listen to the definition of that aggravating circumstance because the whole case is shrouded, shrouded in that decay, that cancer that is decaying this city and that part of that state and what's pervaded every aspect of this case and gave complete motive to this man to blow away William Lloyd.* And that's what the legislature said that is so heinous that when a man does that in and of itself is just cause to pursue the ultimate penalty of death.

*Id.* at 83–84.

When evaluating the prosecutor's statement in the context of his argument on the fourth aggravator, it is evident that the prosecutor merely emphasized that William Lloyd was senselessly killed over a drug dispute, a common enough circumstance that the General Assembly specifically created an aggravator for it in capital cases. Moreover, the prosecutor's reference to the drug crime that is decaying Philadelphia was an isolated reference to the purpose of the aggravator, not a pervasive image repeated throughout the prosecutor's argument.

### 3. References to Victim

Appellant accuses the prosecutor of intentionally inflaming the passions of the jury by reminding it of the

constitutional rights and experiences appellant will continue to experience, but that William Lloyd cannot. Specifically, appellant cites the following passage:

But when you do think about this case and think about the circumstances under which William Lloyd was shot you may consider the fact that this man does not have 12 people sitting in judgment that night in a nice orderly courtroom, with a record being taken and a fair-minded, impartial Judge and the representation of a very, very competent defense attorney and the fact of the United States and Pennsylvania constitutions. William Lloyd didn't have that when he was gunned down. Remember that.

And if Mr. Carson does serve a penalty of life in prison, he is going to be in the prison. He is going to be in general population. He will be confined and his freedom will be restricted, taken away. But he will be in general population and he will get his cable TV and he will have his weights and he will get his chance to exercise and he will eat 3 meals a day and he will be able to shower. And he will be able to do many, many things which is a far cry from the trash heap that William Lloyd fell in when he was shot. All of the rights he has now, Mr. Carson, are the rights that will follow him.

*Id.* at 77–78. According to appellant, this line of argument is inappropriate because it perpetuates a misguided belief that convicted criminals have too many protections. Appellant notes that the prosecutor neglected to mention all of the hardships that he would experience in prison.

The Commonwealth, in turn, cites several cases where this Court has upheld a prosecutor's arguments that ask the jury to show the defendant the same mercy showed to the victim. Additionally, the Commonwealth cites a host of other cases in which this Court found no error with arguments that utilized more oratorical flair than the passage appellant cites.

We have upheld a prosecutor's explicit request of a jury to show the same mercy to a defendant as the defendant showed to his victim. *Commonwealth v. Jacobs*, 556 Pa. 138, 727 A.2d

545, 554 (1999) (citing *Commonwealth v. Basemore*, 525 Pa. 512, 582 A.2d 861, 870 (1990), *cert. denied*, 502 U.S. 1102, 112 S.Ct. 1191, 117 L.Ed.2d 432 (1992)). The prosecutor reminded the jury that, thanks to procedural safeguards, imposing the death penalty was not the same as killing someone on a street corner and that life in prison is not comparable to death. The ultimate issue for the jury in the penalty phase is life in prison or death, and there is certainly nothing inappropriate in discussing and contrasting the two. Moreover, given that this Court has permitted a more passionate form of argument by allowing a prosecutor to describe a defendant with a number of deprecating adjectives, *see Commonwealth v. Kemp*, 562 Pa. 154, 753 A.2d 1278, 1287 (2000), *abrogated on other grounds by, Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003) (prosecutor did not exceed allowable scope of penalty phase argument where he characterized defendant as "callous," "demented," "inhuman," "sick," and "sordid"), counsel cannot be deemed ineffective for failing to object here.

### 4. Characterization of Mitigation Evidence

Next, appellant claims that the Commonwealth improperly diminished his mitigation evidence with the following argument:

> Well, there were many, many children, there are thousands of children in this city who grew up without parents, let alone single parents, who have managed to crawled [sic] and climb under out of that, that ring of poverty and make something out of themselves. And not to be just people who obey the law but people who prevail and go above the law.
>
> There are thousands of them who prevail and any argument to say that Mr. Carson didn't have that opportunity is a slap in the face to any one of those children who managed to succeed, to have managed to climb out of the gutter and make something of themselves instead of putting a bullet through some 53–year–old man's head.

N.T. 7/17/1995 at 82. Appellant contends that it is irrelevant whether other people succeeded under similar circumstances.

Arguing that the prosecutor violated his Eighth Amendment rights, appellant asserts that the above remarks prevented the jury from giving full effect to his mitigation evidence.

We find appellant's claim is without merit, as we agree with the Commonwealth that this Court has expressly permitted a prosecutor to rebut mitigation evidence. *See, e.g., Rollins,* 738 A.2d at 449 (no error in stating that defendant's mitigation evidence was of too little weight to influence the verdict); *Basemore,* 582 A.2d at 869 (prosecutor was permitted to dispute that defendant's age and occupation did not constitute mitigating evidence); *Commonwealth v. Duffey,* 519 Pa. 348, 548 A.2d 1178, 1189 (1988) (no harm in prosecutor's argument that defendant's epilepsy should not constitute mitigation factor). The prosecutor permissibly argued against appellant's catchall mitigator, which appellant supported by offering testimony from his family that appellant provided monetary support for his family and friends.

### 5. Reference to Appellant's Opportunities for Rehabilitation

In his penultimate claim involving penalty phase argument, appellant claims that the prosecutor referred to facts not in evidence by referring to therapy and rehabilitation that appellant had undergone. Appellant also objects to the prosecutor's theory that, during the nine years between his murder conviction and other most recent conviction, appellant was "biding his time" and "building a wave of arrogance." Appellant's Brief at 73; N.T. 7/17/1995 at 86. Appellant posits that this argument prevented the jury from considering the aggravating and mitigating evidence that was actually presented.

The Commonwealth denies that the prosecutor argued facts not in evidence, for appellant's previous adjudications and commitment at a juvenile rehabilitation facility were made part of the record. From these facts, the Commonwealth argues that one could infer that appellant would receive rehabilitation during his commitment. The Commonwealth also gives no weight to appellant's characterization of the

prosecutor's argument as suggesting that appellant waited for nine years to kill an innocent bystander.

 As we have said before, a prosecutor is permitted to argue reasonable inferences from the evidence. *Commonwealth v. LaCava*, 542 Pa. 160, 666 A.2d 221, 231 (1995). Evidence of appellant's previous crimes as a juvenile was admitted into evidence at his sentencing hearing, including mention of his two separate commitments to Glen Mills following adjudications of delinquency, N.T. 7/17/1995 at 50–51. Based on this evidence, it was reasonable for the prosecutor to refer to appellant's unrealized opportunities for rehabilitation while in detention as a juvenile. Lastly, we consider the prosecutor's comment that appellant was "biding his time" nothing more than a reference to appellant's failure to improve himself following his juvenile convictions. Counsel was not obliged to object to the prosecutor's argument.

### 6. Victim Impact

Appellant's final claim relates to the prosecutor's reference that William Lloyd would not have the opportunity to bury his parents. He argues that in conjunction with the testimony from William Lloyd's mother at trial, the prosecutor's argument improperly engendered sympathy for the victim. Appellant asserts that victim impact evidence was neither admissible nor relevant in a capital case at the time of his trial in 1995.

The Commonwealth rejects the notion that the prosecutor made this statement to create sympathy and declares that it was made in response to defense witness testimony that appellant would not get to see his children again if he were sentenced to death. Furthermore, the Commonwealth argues that appellant could not be prejudiced by the prosecutor's statement since the jury, which found no mitigating circumstances, did not have to weigh the aggravating factors versus a mitigating factor.

The mother of appellant's son, Aisha Johnson, made a passionate plea to spare appellant's life during the sentencing

hearing, lamenting that appellant had not had the opportunity to know his son and that she did not want her son growing up not knowing his father. N.T. 7/17/1995 at 57. In response, the prosecutor argued in his closing that while appellant would like to see his children again, William Lloyd would not have the opportunity to survive his parents. *Id.* at 82–831. Therefore, the prosecutor's argument was permissible rebuttal argument to this aspect of appellant's emotional mitigation defense. *See, e.g., Rollins,* 738 A.2d at 449.

### E. Simmons Charge[33]

According to appellant, his trial counsel was ineffective for failing to request a *Simmons* instruction following the prosecutor's closing argument and, thereafter, direct appeal counsel was ineffective for not raising trial counsel's error. Appellant argues that the prosecutor should not have injected the issue of future dangerousness while arguing the significant history of felony convictions aggravator, because future dangerousness is not a statutory aggravating circumstance. Because this Commonwealth requires the jury to weigh aggravators and mitigators, appellant argues, his Eighth Amendment rights were violated by an argument that skewed the "weighing process towards death." Appellant's Brief at 76. Appellant further claims that the prosecutor "opened the door" to the instruction when he argued the amenities appellant could utilize in prison. *Id.* at 77.

The absence of a *Simmons* instruction, appellant continues, constituted a violation of due process because the trial court: (1) allowed his penalty to be imposed by a sentencer acting upon an erroneous understanding of the law; (2) violated his liberty interest in being sentenced by a jury choosing between life without parole and death; and (3) violated the proscription against being sentenced to death based upon information the defendant was not allowed to rebut or explain. Appellant also argues the Eighth Amendment was violated when he was sentenced by a jury that did not have complete and accurate information before it.

**33.** Appellant's claim IV.

The Commonwealth disagrees that the prosecutor addressed appellant's future dangerousness in his closing. Instead, the Commonwealth claims that the prosecutor was discussing the legislative intent behind 42 Pa.C.S. § 9711(d)(9) (significant history of violent felonies aggravator), and "in no way implied that [appellant] posed a future danger." Commonwealth's Brief at 74. Because the prosecutor did not make future dangerousness an issue, the Commonwealth contends that a *Simmons* instruction was not required, especially since appellant did not request such an instruction at the sentencing hearing.

The PCRA court denied appellant's claim, noting that the "jury was amply informed of the life nature of the imprisonment-even including by the prosecutor." PCRA ct. slip op. at 20. Moreover, the PCRA court held that appellant did not establish that he was prejudiced by the absence of the charge.

In *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (plurality), a plurality of the United States Supreme Court would have held that, if a prosecutor argues a capital defendant's future dangerousness at a sentencing trial, the defendant may request and should be granted a jury instruction that a penalty of life in prison will render the defendant ineligible for parole. *Id.* at 170, 114 S.Ct. at 2197. This Court has held that a *Simmons* instruction is mandated only if two events occur: (1) the prosecutor must place the defendant's future dangerousness in issue; and (2) the defendant must have requested that the trial court issue the instruction. *Commonwealth v. Dougherty,* 580 Pa. 183, 860 A.2d 31, 37 (2004), *cert. denied,* —— U.S. ——, 126 S.Ct. 63, 163 L.Ed.2d 89 (2005); *Commonwealth v. Jones,* 571 Pa. 112, 811 A.2d 994, 1004 (2002) (citing *Commonwealth v. Spotz,* 563 Pa. 269, 759 A.2d 1280, 1291 (2000), *cert. denied,* 534 U.S. 1104, 122 S.Ct. 902, 151 L.Ed.2d 871 (2002)). The failure to issue a *Simmons* charge is no basis for relief where these circumstances are not met. *Jones,* 811 A.2d at 1004.[34]

**34.** More recent Supreme Court authority has suggested that a *Simmons* instruction is required where the evidence raises an inference of future dangerousness. *See Kelly v. South Carolina,* 534 U.S. 246, 122 S.Ct.

592

■ Appellant takes issue with trial counsel's failure to object to the following argument made by the prosecutor:

The third aggravating circumstance is that history of felony convictions and when the legislature passed that they were saying to you and to me enough is enough. Mr. Carson, you had your chance. We are not going to let anymore people be injured.

3 felonies, ladies, and gentlemen, two of them came out of the same circumstance with guns, with knives. One of them a 14–year–old. Enough is enough.

N.T. 7/17/1995 at 81. The prosecutor in this instance focuses on appellant's history of violent felony convictions and ties his failure to reform his conduct into the purpose served by this statutory aggravating circumstance. In *Commonwealth v. May*, 551 Pa. 286, 710 A.2d 44, 47 (1998), *cert. denied*, 525 U.S. 1078, 119 S.Ct. 818, 142 L.Ed.2d 676 (1999), this Court found that a *Simmons* charge was not warranted because the violent felonies aggravator which was argued by the prosecutor focused on the defendant's past conduct, not his future dangerousness. We have also held future dangerousness was not implicated where a prosecutor argued that if the defendant was not going to conform his conduct to the law, he should not be allowed to live. *Commonwealth v. Douglas*, 558 Pa. 412, 737 A.2d 1188, 1200 (1999) (Opinion Announcing Judgment of the Court), *cert. denied*, 530 U.S. 1216, 120 S.Ct. 2220, 147 L.Ed.2d 252 (2000). Counsel certainly could have sought to extend the principle in the *Simmons* case; however, given the context of the prosecutor's remark, in light of our precedent, appellant's trial counsel cannot be deemed ineffective for failing to object to this argument.

■ "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at

726, 151 L.Ed.2d 670 (2002). Trial counsel's conduct, however, must be evaluated under the law prevailing at the time of trial, which was the non-precedential plurality in *Simmons*.

689, 104 S.Ct. at 2065. Here, in addition to the fact that *Simmons* was a plurality opinion, any assessment of counsel's performance must acknowledge the difference between the argument that succeeded in *Simmons* and that which appellant belatedly forwards. In *Simmons*, the prosecutor argued that the jury should consider the defendant's future dangerousness as a stand-alone aggravator when considering punishment. 512 U.S. at 157, 114 S.Ct. at 2190. *Simmons* did not address whether argument pertaining to another aggravating circumstance might raise an inference of future dangerousness which would or should trigger the *Simmons* rule. Since then, of course, *Kelly* has expanded the law to include a broader interpretation of evidence that implies future dangerousness, but that case was not decided until well after appellant's direct appeal was complete. An attorney cannot be deemed ineffective for failing to anticipate a change or development in the law. *See, e.g., Sneed,* 899 A.2d at 1076.[35]

**35.** Madame Justice Baldwin's concurrence misapprehends our analysis of the state of the law surrounding *Simmons* at the time of appellant's trial. The concurrence cites *Commonwealth v. Christy,* 540 Pa. 192, 656 A.2d 877 (1995) (plurality), for the proposition that this Court interpreted *Simmons* to require an instruction on the meaning of life in prison whenever a capital defendant's future dangerousness is "at issue" and the defendant requested the instruction. Respectfully, the analysis is not so certain, as the concurrence would have it, to second-guess counsel. *Christy* was decided by a six-Justice court, with only three Justices joining the majority opinion. Additionally, as the concurrence recognizes, the issue in *Christy* was whether the rule announced in *Simmons* applied retroactively, and not the extent to which *Simmons* established grounds to object to various aspects of a prosecutor's penalty phase argument.

More importantly, we cannot agree that the *Simmons* case alone made clear that an instruction was required where argument on a distinct aggravating circumstance may have implied future dangerousness, such as in the instant case where the Commonwealth asked the jury to find the (d)(9) aggravating circumstance. Indeed, the U.S. Supreme Court itself recognized the difficulty in ascertaining the reach of *Simmons* three years after it was decided: "[t]he array of views expressed in *Simmons* itself suggests that the rule announced there was, in light of this Court's precedent, 'susceptible to debate among reasonable minds.'" *O'Dell v. Netherland,* 521 U.S. 151, 159–60, 117 S.Ct. 1969, 1975, 138 L.Ed.2d 351 (1997) (citations omitted). The Court certainly provided eventual guidance on what type of evidence constituted argument on a defendant's future dangerousness in *Kelly,* 534 U.S. at 254, 122 S.Ct. at 732 ("Evidence of future dangerousness under

### F. Juvenile Convictions Used to Support Aggravating Circumstance[36]

Appellant next claims his prior counsel were ineffective in failing to object to the admission of his prior juvenile adjudications to prove the aggravating circumstance that he had a significant history of violent felony convictions under 42 Pa. C.S. § 9711(d)(9), particularly when he had no adult convictions involving the use of violence. While acknowledging that *Commonwealth v. Baker*, 531 Pa. 541, 614 A.2d 663, 675–76 (1992), held that juvenile adjudications could support this aggravating circumstance, appellant submits that the use of the adjudications in his case violates the *Ex Post Facto* Clause; the Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution; and Article 1, Sections 9 and 13 of the Pennsylvania Constitution. Appellant argues that the use of juvenile adjudications to support the (d)(9) aggravating circumstance is unconstitutionally vague, pursuant to the Eighth Amendment and the Due Process Clause, because: (1) the Juvenile Act, 42 Pa.C.S. § 6354(a), states that an adjudication of delinquency is not a conviction of a crime; (2) the (d)(9) aggravating circumstance relates to a significant history of felony convictions; (3) the pre–1996 amended Juvenile Act, 42 Pa.C.S. § 6354(b), did not permit juvenile adjudications to be used in any court proceeding; and (4) the decision in *Commonwealth v. Holcomb*, 508 Pa. 425, 498 A.2d 833 (1985) (plurality), upheld Pennsylvania's death penalty statute, in part, because juvenile adjudications were not used as evidence to support the (d)(9) aggravator. With regard to appellant's *ex post facto* argument, he claims that he did not have the fair warning required by the Eighth and Fourteenth Amendments

*Simmons* is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms."), but this statement of the law was long after the conclusion of appellant's direct appeal. If no reasonable attorney at the time of appellant's trial would have acquiesced to argument concerning the (d)(9) aggravator on the ground that it raised an inference of future dangerousness, as the concurrence suggests, then one must conclude that the U.S. Supreme Court's decision in *Kelly* was superfluous.

**36.** Appellant's claim XV.

of the U.S. Constitution, and Article 1, Sections 9 and 13 of the Pennsylvania Constitution, that a juvenile adjudication could be used to aggravate a murder conviction at the time he was adjudicated delinquent in 1986 and 1987. Finally, he asserts that the expansion of the (d)(9) aggravating circumstance is arbitrary, unreasonable, and unprincipled, which violates the Eighth and Fourteenth Amendment guarantees of heightened procedural safeguards in capital sentencing.

The Commonwealth argues that appellant's claim is previously litigated, since he challenged the applicability of the aggravator on direct appeal. The PCRA court noted that appellant now offers a different argument with respect to the (d)(9) aggravating circumstance, but nevertheless declared appellant's claim was previously litigated.[37]

On direct appeal, appellant argued that trial counsel was ineffective for failing to argue the sufficiency of the evidence used to support the (d)(9) aggravating circumstance. *Carson I*, 741 A.2d at 706–707. Appellant's instant ineffectiveness arguments are obviously distinct from those he advanced on direct review, and thus, we will review them. *See Collins*, 888 A.2d at 573.

We begin by noting that an error in submitting an aggravating circumstance is harmless where the jury finds multiple aggravators and no mitigators. *Commonwealth v. Lester*, 554 Pa. 644, 722 A.2d 997, 1006 n. 15 (1998). In any event, appellant has failed to acknowledge that this Court has repeatedly rejected the argument that the (d)(9) aggravating circumstance is unconstitutionally vague. In *Miller*, 746 A.2d at 604, this Court noted that this argument was previously rejected and declined to revisit the issue. *See also Commonwealth v. Williams*, 557 Pa. 207, 732 A.2d 1167, 1185 (1999); *Commonwealth v. Hill*, 542 Pa. 291, 666 A.2d 642, 654 (1995), *cert. denied*, 517 U.S. 1235, 116 S.Ct. 1880, 135 L.Ed.2d 175 (1996); *Commonwealth v. Fahy*, 512 Pa. 298, 516 A.2d 689,

---

**37.** We observe that, in disposing of this claim, the PCRA court erroneously cited to the aggravator at issue as relating to 42 Pa.C.S. § 9711(d)(13), which refers to killings committed while in the perpetration of a felony. PCRA ct. slip op. at 18–19.

697–98 (1986); *Commonwealth v. Beasley,* 504 Pa. 485, 475 A.2d 730, 737 (1984). Moreover, appellant's approach to settled precedent is novel. Trial counsel was not obliged to challenge settled precedent with this new theory.

■ The *Ex Post Facto* Clause prohibits Congress and the states from passing laws which impose punishment for an act that was not punishable at the time it was committed or imposes additional punishment than was previously prescribed. *Cimaszewski v. Board of Prob. & Parole,* 582 Pa. 27, 868 A.2d 416, 422 (2005) (plurality on other grounds) (quoting *Weaver v. Graham,* 450 U.S. 24, 28, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981)). An *ex post facto* law, in other words, applies to events that occur before it was enacted and burden the offender. *Cimaszewski,* 868 A.2d at 423. In *Gryger v. Burke,* 334 U.S. 728, 68 S.Ct. 1256, 92 L.Ed. 1683 (1948), the United States Supreme Court evaluated the Pennsylvania Habitual Criminal Act in respect to a defendant who was sentenced as a fourth offender, even though one of the defendant's convictions arose before the Act was passed. The Court held that the defendant's categorization as a fourth offender did not impose an additional penalty for earlier crimes, but rather enhanced a penalty for the latest crime. *Id.* at 732, 68 S.Ct. at 1258.

Here, the jury found the (d)(9) aggravator based on appellant's adjudications for crimes that were not considered in capital sentencing deliberations at the time he committed those crimes. For purposes of assessing counsel's effectiveness, the *Gryger* case is significantly analogous as to warrant the conclusion that appellant's novel theory would fail.

Appellant's final challenge to the (d)(9) aggravating circumstance is a broad, unspecific claim that this Court has expanded the application of the aggravator in an arbitrary manner in violation of the Eighth and Fourteenth Amendments. Since appellant fails to couple this claim with particular explanation as to why the use of his juvenile adjudications represents an arbitrary expansion of the aggravator, excluding his unsuccessful arguments above, and does not explain why he believes

counsel was obliged to forward this claim, we reject this argument as well.

### G. Drug Felony Aggravating Circumstance, 42 Pa.C.S. § 9711(d)(13)[38]

Appellant submits that direct appeal counsel was ineffective in the manner in which he argued that 42 Pa.C.S. § 9711(d)(13) was inapplicable to this case. Specifically, appellant argues that direct appeal counsel should have asserted that evidence of a "drug turf war" did not constitute a violation of the Controlled Substance Abuse Act, a finding necessary to prove the aggravator at issue. Appellant contends that appellate counsel was ineffective for not informing this Court of the necessity to strictly construe the aggravating factor, establishing the insufficiency of the facts to support the elements of Section 9711(d)(13), and arguing that the jury's finding violated the requirements of the Due Process Clause and the Eighth Amendment, which mandate that each element of the aggravator must be proven beyond a reasonable doubt.

The Commonwealth claims that appellant's claim has been previously litigated and the PCRA court agreed, but our holding in *Collins* prevents us from employing that particular terminology. *See Collins*, 888 A.2d at 573. On direct appeal, appellant argued that there were insufficient facts to support the (d)(13) aggravating circumstance, because the Commonwealth did not offer evidence that he was engaged in the sale of drugs. *Carson I*, 741 A.2d at 706. Now appellant argues that direct appeal counsel did not present the insufficiency argument with enough particularity to establish that the aggravator was inapplicable to appellant.

Despite the ineffectiveness gloss, the crux of appellant's argument remains the same. We previously found that the evidence was sufficient to establish the (d)(13) aggravating circumstance, *id.*, and, as such, we defer to our prior evaluation of the claim. *See Collins*, 888 A.2d at 574 (although recognizing a defendant's ineffectiveness claim as a distinct claim for review, refusing to reevaluate the direct appeal

---

38. Appellant's claim XVI.

Court's holding on the underlying due process issue). Moreover, even if we were to invalidate our prior holding, appellant cannot show he was prejudiced in being sentenced to death when the jury found three other aggravating factors and no mitigating circumstances. *See Lester*, 722 A.2d at 1006 n. 15.

### H. Sufficiency of Notice of Aggravator 42 Pa.C.S. § 9711(d)(6)[39]

Appellant argues that his prior counsel were ineffective for failing to properly argue that the aggravating circumstance defined in 42 Pa.C.S. § 9711(d)(6) (killing in perpetration of a felony) should have been excluded from the jury's consideration, because the Commonwealth did not comply with Pa. R.Crim.P. 352,[40] in violation of appellant's right to due process of law. Although trial counsel objected that the Commonwealth provided inadequate notice of its intent to offer this aggravating circumstance, appellant claims his argument was insufficient because no citation to case law accompanied the objection and trial counsel failed to argue that the aggravating circumstance was based on the improper admission of Monique Wylie's out-of-court statement during the sentencing phase. Thereafter, appellant says, appellate counsel was ineffective for failing to raise the issues in his direct appeal.

The Commonwealth asks us to hold, as the PCRA court did, that appellant's claim was previously litigated. This Court indeed addressed the adequacy of the notice given to appellant with regard to the instant aggravating circumstance on direct appeal. We found that appellant had constructive notice of the Commonwealth's intent to introduce the (d)(6) aggravating circumstance when he was arraigned on robbery and aggra-

---

**39.** Appellant's claim XVII.

**40.** Rule 352, which has since been renumbered as Rule 802, provides:

The attorney for the Commonwealth shall file a Notice of Aggravating Circumstances that the Commonwealth intends to submit at the sentencing hearing and contemporaneously provide the defendant with a copy of such Notice of Aggravating Circumstances. Notice shall be filed at or before the time of arraignment, unless the attorney for the Commonwealth becomes aware of the existence of an aggravating circumstance after arraignment or the time for filing is extended by the court for cause shown.

vated assault charges in connection with the incidents occurring on the night of William Lloyd's murder. *Carson I,* 741 A.2d at 705. While appellant's layered ineffectiveness claim is distinct from the underlying claim we addressed previously, *see Collins,* 888 A.2d at 573, we decline to revisit the Court's analysis of the underlying claim when appellant's argument on the underlying claim is substantially the same. *See id.* at 574.

Even though this Court did not consider appellant's argument with respect to the admission of Monique Wylie's statement, appellant does not specifically cite which statement he is referring to, excluding a citation to the sentencing hearing transcript to a page where only the trial court is generally explaining aggravating and mitigating circumstances. *Compare* Appellant's Brief at 91, *with* N.T. 7/17/1995 at 44.[41] Consequently, appellant's claim is without merit.

## I. Instructions to Jury on Responsibility for Determining Death Sentence[42]

Appellant next claims that the trial court's instruction erroneously led jurors to believe that they did not have the ultimate responsibility for determining the appropriateness of his death sentence, which violates his due process. First, appellant cites the trial court's statement that the Supreme Court and Governor review a death sentence from a jury. He also notes the trial court's instruction that the jury should follow his summation of the law, not defense counsel's version, because defense counsel has remedies for a trial court's inaccurate statements of the law. When the trial court thus implied that the jury was not responsible for his death sentence, appellant alleges that it caused the jury to give less consideration to his proffered mitigating evidence. Appellant denies that the trial court's instruction was necessary to dispel the idea that the prosecutor "is not an execution chamber," Appellant's Brief at 92, because such a statement is self-

41. Appellant actually cites the transcript date as being recorded in 1997, two full years after his sentencing trial.

42. Appellant's claim XVIII.

evident. Appellant ultimately attaches these arguments to a boilerplate layered ineffectiveness claim.

The Commonwealth argues that the trial court appropriately corrected defense counsel's reference to the prosecutor as operating the "execution chamber." The trial court's correction, according to the Commonwealth, explained that when a defendant is sentenced to death by a jury he is executed by lethal injection. Moreover, the Commonwealth cites *Commonwealth v. Beasley*, 524 Pa. 34, 568 A.2d 1235 (1990), for the proposition that this Court has approved of a prosecutor's suggestion that even if a defendant were sentenced to death, he would not be executed.

The PCRA court noted that *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), would indicate that the trial court's statements were improper, but ruled that the jury's findings on aggravating and mitigating circumstances showed that appellant was not prejudiced by the trial court's instruction.

In *Caldwell*, the United States Supreme Court evaluated the propriety of the prosecutor's response to defense counsel's sentencing phase argument repeatedly emphasizing that the jury had "an awesome responsibility" in deciding whether to sentence the defendant to life in prison or death. *Id.* at 324, 105 S.Ct. at 2637. Specifically, the prosecutor responded by stating:

> I'm in complete disagreement with the approach the defense has taken. I don't think it's fair. I think its unfair. I think the lawyers know better. Now, they would have you believe that you're going to kill this man and they know—they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable. They know it.

*Id.* at 325, 105 S.Ct. at 2637 (citations and quotation marks omitted). Despite defense counsel's objection to the prosecutor's argument, the trial court acquiesced in the prosecutor continuing his argument in the same vein. *Id.* at 325–26, 105 S.Ct. at 2638. The High Court found the prosecutor's argu-

ment unacceptable, as it concluded that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328–29, 105 S.Ct. at 2639. While the Court acknowledged its decision in *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) (capital sentencing juries may be informed of the Governor of California's ability to commute a sentence of life imprisonment), approving the distribution of accurate post-sentence information to a jury, it disapproved of the *Caldwell* prosecutor's inaccurate implications regarding post-sentencing procedure and observed that the argument was not linked to a valid sentencing consideration. *Caldwell*, 472 U.S. at 336, 105 S.Ct. at 2643.

Evaluating a case under *Caldwell*, this Court has found error with a trial court's instruction to the jury that:

Now, with regard to death penalty, you know what that implies. Somewhere down the line, if you do impose the death penalty, the case will be reviewed thoroughly. And after thorough review the death penalty may be carried out. I won't go into all the various reviews that we have. That shouldn't concern you at this point.

*Commonwealth v. Jasper*, 558 Pa. 281, 737 A.2d 196, 196 (1999). The *Jasper* Court found the following factors particularly troublesome in reaching its decision: (1) the trial court "unduly" emphasized the role of the appellate courts by suggesting that the death sentence might not be carried out; and (2) the jury found two aggravating circumstances and one mitigating circumstance. *Id.* at 197–98. This Court stated its unwillingness to adopt a *per se* rule that reference to the appellate process is impermissible, because we recognized that defense counsel's argument may necessitate a reference to appellate review. *Id.* at 198. Notably, in *Commonwealth v. Williams*, 554 Pa. 1, 720 A.2d 679, 691 (1998), *cert. denied*, 526 U.S. 1161, 119 S.Ct. 2052, 144 L.Ed.2d 219 (1999), we found no error with a trial court's instruction that a defendant had a

right to appeal his case if he believed an error occurred at trial.

In this case, the challenged instruction resulted from the prosecutor's objection to defense counsel's statement that the jury was not in the prosecutor's execution chamber. The trial court sustained the objection and told the jury:

> The prosecutor is not an execution chamber. What it is a place in the State of Pennsylvania that a certain institution behind in where lethal injection is given to those who are committed to death by a jury and when that sentence has been imposed by the Judge and as reviewed by the supreme court and the governor.

> And that is the legal place of execution which is referred to in my formal sentencing if the jury were to find it. It's not the prosecution's execution chamber.

N.T. 7/17/1995 at 133 (errors in original). Here, the trial court's instruction was not aimed at explaining to the jury how much responsibility the jury should feel for returning a penalty of death, but rather the trial court explained that the State of Pennsylvania, not the prosecutor, physically executes individuals after a jury imposes a sentence of death. The trial court's explanation of the place of a defendant's execution would not be thorough without reference to the procedures that occur before he is executed. Moreover, the instruction did not serve to shift responsibility away from the jury for giving appellant the death sentence by implying it was not the ultimate decision-maker, suggest that the jury should not feel gravely responsible for imposing the death penalty, or imply that any death sentence imposed by the jury might not be carried out.[43] Appellant's jury also did not find any of his

---

**43.** During the trial court's formal sentencing instructions to the jury, it further emphasized the weight of the jury's responsibility:

> I want you to remember that your verdict is not here for recommendation. It actually fixes the punishment in either death or life imprisonment. . . .

* * *

> You're not just telling me what you think ought to be done. You're telling me what I'm going to have to do. The law says must. I must impose the verdict that you bring in.

proffered mitigating factors, unlike the defendant in *Jasper.* For these reasons, we conclude that the issue underlying appellant's ineffectiveness claim is without merit.

## J. Sympathy for Appellant[44]

Appellant next accuses the prosecutor of making an improper argument that the jury should not consider sympathy for appellant during its deliberations, citing the prosecutor's argument that:

> Mr. Greene is going to stand up here and he is going to say everything he can possibly say to get you to sympathize as he did with the evidence in this case with this defendant. I don't want you sympathizing with anybody, the victim or the defendant. It's not a matter of sympathy.

> It cannot be a matter of sympathy because then we are thinking with our guts and we can't do that. It would render our system of justice meaningless.

N.T. 7/17/1995 at 77. Appellant contends his trial counsel was ineffective when he did not object to the argument or seek a corrective instruction from the trial court, and appellate counsel was ineffective for neglecting to pursue it on direct appeal. Appellant asserts that the prosecutor's argument was compounded by the trial court's instruction that: "I don't want to sound cold blooded, but you must decide [the case] on the evidence, not on any sympathy, not on any prejudice, not on anything that influences you or raises passions in you." N.T. 7/18/1995 at 25.

The Commonwealth argues that appellant's "barebones boilerplate" ineffectiveness claim cannot overcome his waiver of the claim, adding further that the underlying claim is frivolous. Commonwealth's Brief at 80. The Commonwealth includes a lengthy string citation to cases by both this Court and the United States Supreme Court rendering holdings directly

---

N.T. 7/18/1995 at 26. If the jury had any doubt about its responsibility after the trial court's passing reference to the review process, that ambiguity was eradicated with this instruction.

**44.** Appellant's claim XIX.

contradictory to the underlying issue in appellant's ineffectiveness claim.

The PCRA court rejected appellant's claim under *Commonwealth v. Rainey,* 540 Pa. 220, 656 A.2d 1326 (1995), *cert. denied,* 516 U.S. 1008, 116 S.Ct. 562, 133 L.Ed.2d 488 (1995), reading the case to instruct that a sympathy charge was not required and, if one were given, the trial court is required to state that "sympathy must be based on the mitigating circumstances." PCRA ct. slip op. at 21.

Just as the United States Supreme Court has ruled, this Court has approved of trial court instructions that command the jury not to be influenced by sympathy in arriving at a verdict. *See, e.g., Saffle v. Parks,* 494 U.S. 484, 495, 110 S.Ct. 1257, 1264, 108 L.Ed.2d 415 (1990) (approving an anti-sympathy instruction, by concluding that: "The objectives of fairness and accuracy are more likely to be threatened than promoted by a rule allowing the sentence to turn not on whether the defendant, in the eyes of the community, is morally deserving of the death sentence, but on whether the defendant can strike an emotional chord in a juror."); *Commonwealth v. Blystone,* 555 Pa. 565, 725 A.2d 1197, 1208 (1999) (noting anti-sympathy instructions do not generally violate the Eighth Amendment); *Rainey,* 656 A.2d at 1333–34 (defendant not entitled to blanket jury instruction that he is entitled to mercy without qualification because sympathy must only come from proven mitigating circumstances). This Court is also statutorily required to overturn any judgment that was the result of "passion, prejudice, or any arbitrary factor." 42 Pa.C.S. § 9711(h)(3)(i).

When the trial court instructed the jury on aggravating and mitigating circumstances, it made clear that the jury could consider any evidence presented at the trial in respect to appellant's third proffered mitigating circumstance, the catch-all mitigator. N.T. 7/18/1995 at 20. The trial court properly told the jury to consider the submitted aggravating and mitigating circumstances according to the evidence presented, but that it may not be abstractly swayed by sympathy or prejudice. *Id.* at 25. Appellant's underlying argument that the trial court's instruction was improper is simply factually

and legally incorrect. Accordingly, his layered ineffectiveness claim does not entitle him to relief.

## K. Trial Court's Instructions on Aggravating and Mitigating Circumstances[45]

According to appellant, the trial court violated the Eighth Amendment when it instructed the jury that aggravating and mitigating circumstances are factors that make a murder case more or less terrible. Appellant declares that the trial court's instruction prevented the jury from thinking of him as an individual, by limiting the jury to considering circumstances only related to the crime, and that this erroneous instruction was compounded by the prosecutor's argument that the jury should not consider sympathy during its deliberations. He also accuses the prosecutor of telling the jury to ignore mitigating factors. Again, appellant attaches his grievances with the trial court's instruction to a boilerplate claim of layered counsel ineffectiveness, claiming his prior counsel should have objected to the trial court's incorrect instructions.

The Commonwealth counters that appellant's claim is invalid under settled law. Likewise, the PCRA court found no error with the trial court's instruction.

Addressing arguments similar to those appellant raises here, this Court has approved of the instructions given by the trial court in this case. *Commonwealth v. Spotz,* 587 Pa. 1, 896 A.2d 1191, 1246–47 (2006); *Commonwealth v. Johnson,* 572 Pa. 283, 815 A.2d 563, 587–88 (2002); *Commonwealth v. Stevens,* 559 Pa. 171, 739 A.2d 507, 527 (1999). Furthermore, appellant overlooks the trial court's instruction to the jury, regarding the catchall mitigating circumstance, that it should consider all the mitigating evidence that appellant presented at the penalty phase and throughout the trial. N.T. 7/18/1995 at 20. In doing so, the trial court gave the jury permission to look at all record-based factors regarding appellant's life. Finally, we reject appellant's unsupported argument that the prosecutor told the jury to ignore mitigating evidence or that

**45.** Appellant's claim XX.

▐

it should not consider mitigating circumstances during its deliberations. Appellant's claim is unworthy of relief.

## L. Instruction on Unanimity of Life Verdict[46]

� In appellant's penultimate claim, he argues that the trial court erred when it instructed the jury that: "[w]hen you come to your final verdict whether it's death or life imprisonment it must be unanimous. Each and every member of the jury, all twelve must agree on the final verdict, death or life imprisonment." N.T. 7/18/1995 at 26. Appellant says that this instruction conflicted with an earlier trial court instruction that if the jury could not agree on one of the aggravating circumstances, the jury could only impose a sentence of life in prison. *Id.* at 2–3. Before attaching this claim to a layered counsel ineffectiveness claim, appellant asserts that the trial court's charge deprived him of his due process rights.

The Commonwealth counters by stating that the trial court's instructions on the unanimity required for aggravating and mitigating circumstances was legally proper, whereas the passage appellant referred to related only to the trial verdict. The Commonwealth's argument echoes the reasoning offered by the PCRA court in rejecting appellant's claim.

▐ When reviewing a jury instruction, we must do so by evaluating the instruction as a whole to ascertain whether it fairly conveys the required legal principles at the heart of a dispute. *Spotz,* 896 A.2d at 1247. An instruction will be upheld if it clearly, accurately, and adequately explains the law. *Commonwealth v. Chambers,* 570 Pa. 3, 807 A.2d 872, 882 (2002). In *Chambers,* we reiterated that a capital sentence should be vacated if the jury instructions could be interpreted as mandating a unanimous finding as to mitigating circumstances. *Id.*

Here, at the outset of the trial court's instructions, the jury was instructed that it must return a life sentence if all twelve jurors could not agree on one aggravating circumstance or that the aggravating circumstances it found was outweighed

**46.** Appellant's claim XXI.

by the found mitigating circumstances. N.T. 7/17/1995 at 2–3. The trial court clearly explained to the jury that it must unanimously find aggravating circumstances, but that it was not required to reach unanimity when evaluating mitigating circumstances. *Id.* at 23–24, 807 A.2d 872. Although the trial court said that a sentence of life or death must be found unanimously, *id.* at 26, 807 A.2d 872, it qualified that instruction by explaining that:

Now if you do not agree unanimously on a death sentence or on one of the two general findings that would support the death sentence, then you have 2 options immediately. You can either continue and discuss the case and deliberate the possibility of a sentence, or if you all agree, you may stop deliberating and sentence the defendant to life imprisonment.

If you can come to a point where you have deliberated conscientiously and thoroughly and still cannot all agree to either sentence the defendant to death or to life imprisonment, then you would come back and tell me that you cannot agree.

And if I decide that you are hopefully [sic] deadlocked, under the law I then must, it is my duty under the law to, I must impose a life imprisonment.

*Id.* at 27–28, 807 A.2d 872. After reviewing the trial court's instructions in their entirety, this Court is satisfied that the jury was adequately apprised of the legal requirements of unanimity, or implications of its absence, in the capital sentencing process. Additionally, even if we were to find error in the trial court's instructions, counsel cannot be faulted for failing to object because the jury found four aggravating circumstances and no mitigating circumstances, which mandates that the jury must impose the death sentence. This claim fails.

## M. Cumulative Error[47]

Appellant's final claim is that even if this Court finds that appellant is not entitled to relief on any of the claims argued

47. Appellant's claim XXII.

above, he is nonetheless entitled to relief due to the cumulative effect of the errors, which functioned to deprive appellant of a fair trial and heightened procedural precautions owed to capital cases. The Commonwealth contends that appellant is not entitled to relief if none of his individual claims entitles him to it. Indeed, it is a proper assessment of the law to state that since we have found no merit to any one of appellant's individual claims, this Court must conclude that the cumulative effect of the alleged errors does not entitle appellant to relief. *E.g., Brown,* 872 A.2d at 1158; *Blystone,* 725 A.2d at 1208–09. Alternatively, since appellant's claim does not appear to have been raised before the PCRA court, the claim is waived. *See* Pa.R.A.P. 302(a); *Bond,* 819 A.2d at 39.

## IV. CONCLUSION

For the foregoing reasons, we affirm, in part, and remand, in part, for an evidentiary hearing consistent with this opinion.

Justice NEWMAN and Justice EAKIN join the opinion.

Chief Justice CAPPY files a concurring opinion.

Justice BALDWIN files a concurring opinion in which Justice BAER joins.

Justice SAYLOR files a concurring and dissenting opinion.

Chief Justice CAPPY, concurring.

I join the majority opinion save for footnote 35 on pages 593–94, 913 A.2d at 274. Respectfully, I disagree with the interpretation the majority forwards regarding "future dangerousness" as that concept has evolved in Pennsylvania. Although *Simmons*[1] itself may have narrowly limited the instruction requirement to instances when "future dangerousness" arose as a stand-alone aggravator, I believe that any

1. *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (plurality).

inquiry regarding *Simmons* must be informed by Pennsylvania law following *Simmons.*

Accepting that the state of the law in Pennsylvania remained uncertain at the time of this court's plurality decision in *Commonwealth v. Christy,* any lack of clarity was rectified in its immediate aftermath. Following *Christy,* our case law spoke in terms of "future dangerousness" being placed "at issue" by either party, and did not place a restriction on the rule that it was limited to those circumstances when future dangerousness was raised as a stand-alone aggravator. *See, e.g., Commonwealth v. King,* 554 Pa. 331, 721 A.2d 763, 779 (1998) (pointing out that a *Simmons* instruction was not required when "the issue of future dangerousness was not before the jury. *At no time during either phase of trial* did the prosecutor argue or suggest that the death penalty should be imposed because Appellants could potentially hurt someone else . . . .") (emphasis added); *Commonwealth v. Chandler,* 554 Pa. 401, 721 A.2d 1040, 1046 (1998) (noting that a *Simmons* instruction was required "[u]nder the current state of the law, where future dangerousness is *at issue* and a specific request is made by a capital defendant") (emphasis added); *Commonwealth v. Clark,* 551 Pa. 258, 710 A.2d 31, 36 (1998) (extending rule in *Christy* to include either counsel and noting that in *Christy,* "this court acknowledged the applicability of Simmons to cases in Pennsylvania decided subsequent to Simmons, where the issue of the defendant's future dangerousness was raised"); *Commonwealth v. Smith,* 544 Pa. 219, 675 A.2d 1221, 1232 (1996) (noting that "[t]his court held in *Christy* that *Simmons* mandates that where future dangerousness is at issue and a specific request is made by the capital defendant, it is a denial of due process to refuse to tell a jury what the phrase 'life sentence' means"); *see also Commonwealth v. Trivigno,* 561 Pa. 232, 750 A.2d 243 (2000)(Opinion Announcing the Judgment of the Court) (concluding that it was error for prosecutor to argue future dangerousness as part of the criminal history aggravator). Accordingly, I tend to agree with Madame Justice Baldwin that defense counsel would be obliged to request a *Simmons* instruction whenever the prosecutor injected "future dangerousness" into the penalty phase after *Christy.*

Nevertheless, I join the majority's analysis of this issue, since I agree that the statement at issue related to past conduct and did not implicate Appellant's "future dangerousness." *See Commonwealth v. Williams,* 557 Pa. 207, 732 A.2d 1167, 1186 (1999); *Commonwealth v. Robinson,* 554 Pa. 293, 721 A.2d 344, 355 (1998).[2]

Justice BALDWIN, concurring.

I join the majority opinion, with the exception of Part III, Section E, entitled "Simmons Charge," where I only concur in the result. I write separately because I disagree with the majority's analysis in that section. I believe the prosecutor's use of language that stated "enough is enough," "you had your chance," and "[w]e are not going to let anymore people be injured" unquestionably placed Appellant's future dangerousness at issue in this case. Nevertheless, I fail to see how prejudice necessarily resulted from trial counsel's failure to request the instruction in this case. Consequently, while we employ different approaches, I am compelled to reach the same result as the majority.

In order to succeed on a claim of ineffective assistance of counsel, Appellant must demonstrate that: (1) the underlying claim has arguable merit; (2) counsel had not reasonable basis for his action or inaction; and (3) prejudice resulted from counsel's deficient performance. *Commonwealth v. Pierce,* 515 Pa. 153, 157–59, 527 A.2d 973, 975–77 (1987). Here, Appellant alleges that his trial counsel was ineffective for failing to request a jury instruction pursuant to *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (plurality), which would have instructed the jury that life imprisonment means life in prison without the possibility of parole. Appellant further argues that appellate counsel was ineffective for failing to raise this alleged error by trial counsel.

---

**2.** We have implied in the past that statements allegedly implicating "future dangerousness" must be read in context, and when read in context, I agree with the majority that the statement related to past conduct. *See Commonwealth v. Fisher,* 559 Pa. 558, 741 A.2d 1234, 1244 (1999).

In *Simmons,* a plurality of the United States Supreme Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." *Id.* at 156, 114 S.Ct. at 2190. As the majority correctly notes, this Court has held that a *Simmons* instruction is mandated only when: (1) the prosecutor places the defendant's future dangerousness in issue; and (2) the defendant requests the instruction. *See* Majority Opinion at 591, 913 A.2d at 273. (citations omitted). The majority goes on to find that Appellant's future dangerousness was not placed at issue, and, therefore, Appellant's claim is without arguable merit. I disagree.

The contested language was part of the prosecutor's closing argument. It reads as follows:

The third aggravating circumstance is that history of felony convictions and when the legislature passed that they were saying to you and to me enough is enough. Mr. Carson, you had your chance. We are not going to let anymore people be injured.

[Three] felonies, ladies, and gentlemen, two of them came out of the same circumstances with guns, with knives. One of them a [fourteen]-year-old. Enough is enough.

N.T. 7/17/1995 at 81.

The majority relies on *Commonwealth v. May,* 551 Pa. 286, 710 A.2d 44 (1998) in finding that the above language did not inject Appellant's future dangerousness into the case. Rather, the majority concludes that the prosecutor merely focused on Appellant's past conduct and linked that conduct to the purpose of the statutory aggravating circumstance of significant history of violent felony convictions.[1] *See* Majority Opinion at 592, 913 A.2d at 273. To the contrary, *May* was not a case that addressed the question before us in the instant matter, because the Appellant in *May* failed to challenge, or even identify, specific language used by the prosecutor that placed his future dangerousness at issue. We held that no *Simmons*

1. *See* 42 Pa.C.S. § 9711(d)(9).

instruction was required. Stated otherwise, although we rejected the "future dangerousness" argument in *May* as "meritless," that determination resulted from the legal argument presented in that case. May contended that simply arguing the aggravating circumstance of a significant history of violent felony convictions necessarily injected future dangerousness of a criminal defendant into the case. *Id.* at 291, 710 A.2d at 47. We did not hold, nor infer, however, that language used while arguing that specific aggravating factor could never amount to placing a defendant's future dangerousness at issue. Thus, *May* is not dispositive of the matter *sub judice.* If that were the case, a prosecutor could essentially place future dangerousness at issue, but couch it in an argument pertaining to his history of felony convictions, and do so with impunity. *May* requires no such result.

In my view, as aforementioned, the prosecutor's argument placed Appellant's future dangerousness at issue. The use of the phrase, "[w]e are not going to let anymore people be injured," coupled with an argument regarding Appellant's prior felonies can only be interpreted to mean that Appellant has committed violent felonies in the past, and unless he is executed, he will continue to commit violent felonies. Together with the use of the words "enough is enough," and ". . . you had your chance," the undeniable effect of the prosecutor's closing argument was to place Appellant's future dangerousness before the sentencing jury. While the prosecutor did not specifically state that Appellant would be a danger if he was not executed, such language is not required to warrant the instruction. *See Commonwealth v. Chandler,* 554 Pa. 401, 414–15, 721 A.2d 1040, 1046 (1998) (*Simmons* instruction was necessary even though the prosecutor did not use specific future dangerousness language. The absence of precise wording could not overcome the effect of the prosecutor's statements). Consequently, I would find that Appellant's claim has arguable merit, meeting the first prong of the *Pierce* standard for reviewing claims of ineffective assistance of counsel.

I also depart from the majority's finding that even if Appellant's future dangerousness was implicated, "it is doubt-

ful that reasonable attorneys would have believed a *Simmons* instruction would be warranted under the state of the law at the time [A]ppellant was on trial." *See* Majority Opinion at 593, 913 A.2d at 274. The majority seemingly interprets *Simmons* to encompass only the situations where a prosecutor argues future dangerousness as the sole aggravating factor in a capital sentencing phase, and that this concern was unknown prior to the decision in *Kelly v. South Carolina,* 534 U.S. 246, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002), which was decided years after Appellant's trial. *Kelly* expanded *Simmons* to include a broader array of circumstances that place future dangerousness at issue and require the instruction. The language in *Simmons,* however, does not support the majority's narrow interpretation.

Although *Simmons* was a plurality opinion, the core holding is not unclear. Indeed, seven Justices found that due process required informing the jury, either by an instruction or by defense rebuttal, that life in prison means life without parole if future dangerousness of the defendant is injected into the case. *See Simmons,* 512 U.S. at 156, 114 S.Ct. at 2190;[2] *id.* at 172, 114 S.Ct. at 2198 (Souter, J., concurring);[3] *id.* at 174, 114 S.Ct. at 2199 (Ginsburg, J., concurring); *id.* at 178, 114 S.Ct. at 2201 (O'Conner, J., concurring).[4] In my view, a reasonable attorney, particularly one who undertakes the immense responsibility of representing a capital defendant, should have understood *Simmons* as warranting a request for a "life means life" jury instruction, if future dangerousness is at issue. Further, *Simmons* was decided over one year before the commencement of Appellant's trial. Moreover, prior to Appellant's trial, this Court expressly discussed *Simmons* in *Commonwealth v. Christy,* 540 Pa. 192, 656 A.2d 877 (1995) (holding that *Simmons* did not apply retroactively). In *Christy,* we stated, "*Simmons* mandates that where future

2. Justice Blackman announced the judgment of the Court, which was joined by Justice Stevens, Justice Souter, and Justice Ginsburg.

3. Justice Souter's concurring opinion was joined by Justice Stevens.

4. Justice O'Conner's concurring opinion was joined by Chief Justice Rehnquist and Justice Kennedy.

dangerousness is at issue and a specific request is made by the capital defendant, it is a denial of due process to refuse to tell a jury what the term 'life sentence' means." *Christy*, 540 Pa. at 216, 656 A.2d at 889. Therefore, at the time of Appellant's trial, trial counsel had the benefit of the Supreme Court's decision in *Simmons* and a decision from this Court interpreting the *Simmons* holding to require a "life means life" instruction. Trial counsel failed to do so in this case. For these reasons, the majority's conclusion that Appellant's claim lacks arguable merit is puzzling to say the least.

More importantly, the text of *Simmons* does not support a limited application of the case to only situations where a prosecutor specifically argues future dangerousness or where it is the sole aggravating factor argued. Rather, the Court reached its decision based on general arguments of a prosecutor. The lead opinion employed the following language, " . . . particularly when the prosecution *alluded* to the defendant's future dangerousness in its argument to the jury . . ." *Simmons*, 512 U.S. at 164, 114 S.Ct. at 2194 (emphasis added); "[t]he state raised the specter of petitioner's future dangerousness *generally* . . ." *id.* at 165, 114 S.Ct. at 2194 (emphasis added); and "[t]he [s]tate may not create a false dilemma by advancing *generalized* arguments regarding the defendant's future dangerousness . . ." *id.* at 171, 114 S.Ct. at 2198 (emphasis added). *See also Chandler, supra.*

In light of the above, I do not agree that the state of the law at the time of Appellant's trial was in such a state of flux that no reasonable attorney would have believed a *Simmons* instruction would have been warranted. To the contrary, a competent capital defense attorney should have requested the instruction, particularly when armed with the *Simmons* decision decided over a year prior to trial and a subsequent decision by this Court. Accordingly, I would find that trial counsel's failure to request a "life means life" instruction was without a reasonable basis. However, I concur in the result because Appellant failed to demonstrate that he suffered prejudice as a result of his counsel's failings. Appellant merely states that he was prejudiced because his sentence was

not reversed. Brief for Appellant, at 79. Such a bald assertion is insufficient to meet the prejudice prong of the *Pierce* standard.

Therefore, while I recognize that this is case is not a direct appeal, rather a claim of ineffective assistance of counsel under the PCRA,[5] I still write separately to restate, and adopt, the position taken by former members of this Court in the past, that a *Simmons* instruction should be mandated in every capital case, regardless of whether the prosecutor expressly or impliedly places a defendant's future dangerousness at issue, or whether capital defense counsel formally requests the instruction. *See Commonwealth v. Clark,* 551 Pa. 258, 283–86, 710 A.2d 31, 43–44 (1998) (Nigro and Zappala, J.J., concurring).[6] I announce my position here because I believe that mandating the instruction will eliminate the endless stream of litigation that accompanies this issue, including claims of ineffective assistance of counsel.

As the United States Supreme Court has recognized, "a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system." *Simmons,* 512 U.S. at 162, 114 S.Ct. at 2193, citing *Jurek v. Texas,* 428 U.S. 262, 275, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976) (joint opinion of Stewart, Powell, and Stevens, J.J.) (noting that "any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what sentence to impose."). I do not find it necessary to require the prosecutor to inject future dangerousness into the case or require defense counsel to make a formal request for an issue that, I believe, is implicated in any death penalty sentencing hearing. Mandating the instruction in every case would not be an absurdity. In fact, at the time *Simmons* was decided, Pennsylvania was only one of three states that had a life without parole sentencing alternative that did not mandate the instruction. *See Shafer v. South Carolina,* 532 U.S. 36, 49 n. 4, 121 S.Ct. 1263, 1271 n. 4, 149 L.Ed.2d 178 (2001). Pennsylvania's status remains unchanged. Lastly, it is not

**5.** 42 Pa.C.S. §§ 9541–9546.

**6.** Former Chief Justice Flaherty joined J. Nigro's concurring opinion.

only reasonable, but also likely, that whether a capital defendant will be released on parole if given life imprisonment will enter into the minds of deliberating juries. I see no reason to hide the fact that life imprisonment, in Pennsylvania, means life without parole. I cannot accept the premise that the prosecution would be prejudiced by this simple, relevant truth. Hiding the truth is antithetical to our system of justice. This is of the utmost concern in capital cases.

Justice BAER joins this concurring opinion.

Justice SAYLOR, concurring and dissenting.

I join the majority in remanding for a post-conviction evidentiary hearing concerning the sufficiency of trial counsel's stewardship connected with the presentation of mitigation circumstances in the penalty phase of Appellant's trial, but I would broaden this remand to include at least some ineffectiveness claims arising from the guilt phase of trial. Notably, Appellant's post-conviction evidentiary proffer includes a declaration from his trial counsel indicating that counsel failed to attempt to locate a material witness and to pursue available avenues for impeachment of the testimony of critical Commonwealth witnesses. In his declaration, counsel further indicates that he had no strategic or tactical reasons for such failures. In light of such a proffer, it is my position that it is appropriate for the PCRA court, in the first instance, to hear the relevant testimony and issue appropriate findings of fact and conclusions of law on a developed record.

The majority proceeds, without the benefit of evidence concerning the extra-record claims, to evaluate the cold trial record and to offer various conclusions concerning the potential impact of better performance by trial counsel. For example, with regard to the potential impeachment of one Commonwealth witness, the majority indicates "[e]stablishing that Mr. Burton was involved in other illegal activities would not ineluctably alter the jury's opinion of him, much less lead to a different verdict." Majority Opinion at 557, 913 A.2d at 252. It is not a post-conviction petitioner's burden, however, to

establish conclusions ineluctably (or inescapably). According to the United States Supreme Court, whose decisions this Court follows in the ineffectiveness arena:

> Although a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under *Strickland [v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ], a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S., at 694, 104 S.Ct. at 2068. According to *Strickland,* "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ibid.* The *Strickland* Court noted that the "benchmark" of an ineffective-assistance claim is the fairness of the adversary proceeding. . . .

*Nix v. Whiteside,* 475 U.S. 157, 175, 106 S.Ct. 988, 998, 89 L.Ed.2d 123 (1986).

Pursuant to this standard, I maintain my perspective that these cases involving allegations of serious constitutional violations with supporting evidentiary proffers should be assessed on a developed evidentiary record. *Accord Commonwealth v. Bryant,* 579 Pa. 119, 164, 855 A.2d 726, 752 (2004) (Saylor, J., dissenting) ("My position is that the Court would give better effect to the values of regularity and fairness that are essential to the judicial function by requiring closer and more consistent adherence to the procedures that have been designed to ensure the reliability of criminal convictions, particularly in the capital arena, where the need for reliability is at its greatest."). Further, relative to these fact-sensitive inquiries, I believe that a fact-finder (here, the PCRA court) should determine which, if any, of the instances of asserted ineffectiveness are true in light of the post-conviction evidence before the collective impact of any deficient stewardship upon the fairness of the trial proceedings can be reasonably evaluated.

I also differ with the majority opinion to the degree that it suggests that counsel cannot be deemed ineffective for failing to advance arguments merely because supporting theories

618

have not yet been accepted by any controlling tribunal, *see* Majority Opinion at 569–70, 576, 913 A.2d at 260, 264. In this regard, I maintain the perspective that competent counsel should pursue reasonably available theories that are likely to vindicate client interests, regardless of whether those theories have been definitively accepted by the courts. *Cf. Commonwealth v. Hughes*, 581 Pa. 274, 334–35 n. 40, 865 A.2d 761, 797–98 n. 40 (2004) ("We decline to accept ... the proposition that an ineffectiveness challenge based on counsel's failure to pursue vindication of generally prevailing precepts in the capital sentencing context is necessarily foreclosed solely because the Court had not at the time announced that those salient prevailing and generally applicable principles should apply in capital sentencing determinations."). However, to the degree that the theories have no merit, or are not readily available, I agree with the majority that counsel should not be faulted.